Argued and submitted January 24, affirmed January 22, 1985

## MAINE BONDING & CASUALTY COMPANY,
### *Respondent on Review,*

*v.*

## CENTENNIAL INSURANCE COMPANY,
### *Petitioner on Review.*

### (CA A23760; SC 29943)

693 P2d 1296

Michael A. Lehner, Portland, argued the cause for petitioner on review. With him on the briefs and petition were Mitchell, Lang & Smith, Portland.

Emil R. Berg, Portland, argued the cause for respondent on review. With him on the briefs were John R. Barker, and Wolf, Griffith, Bittner, Abbott & Roberts, Portland.

PETERSON, C. J.

## PETERSON, C. J.

The resolution of this case turns upon the answer to this question: When an insured has a layer of "primary" liability insurance and a layer of "excess" liability insurance above the primary, what duty, if any, is owed by the primary liability insurer to the excess liability insurer?

This case involves a classic primary-excess insurance relationship resulting from the purchase by the insured, Great Balls of Fire, Inc., of two separate policies, one providing primary coverage and the other providing excess coverage.[1] Great Balls of Fire purchased a property damage liability policy from defendant Centennial Insurance Company (Centennial), with policy limits of $100,000. Great Balls of Fire also purchased an excess property damage liability policy from Maine Bonding & Casualty Co. (Maine), with limits of two million dollars above the limits of the underlying Centennial policy.

The negligence of Great Balls of Fire caused fire damage to the property and business of Gene Hamilton on March 2, 1977. Hamilton's claim against Great Balls of Fire ultimately was settled for $475,000, comprised of Centennial's $100,000 policy limits and $375,000 from Maine. After the Hamilton claim was settled, Maine brought this action against Centennial, contending that Centennial's wrongful acts in investigating and defending the Hamilton litigation caused Maine's share of the settlement to be higher than it otherwise would have been.

A jury returned a verdict in favor of Maine in the sum of $62,000, and judgment was entered thereon, Centennial appealed, claiming that the trial court erred in denying its motion for directed verdict "because there was not sufficient evidence for a jury to find that Defendant acted in bad faith or

---

[1] The text uses the phrase "classic primary-excess insurance relationship." This is not a case in which two or more liability policies each provide valid and collectible insurance against a loss and the question is whether one or the other is "primary" or "excess." Such cases normally involve construction of the "other insurance" clauses of the policies. *Lamb-Weston, Inc. v. Ore. Auto. Ins. Co.* 219 Or 110, 341 P2d 110, 346 P2d 643 (1959), is the seminal Oregon case in this area. Related cases include *United Pac. Ins. Co. v. Truck Ins. Exch.,* 273 Or 283, 541 P2d 448 (1975); *Liberty Mut. Ins. v. Truck Ins.,* 245 Or 30, 420 P2d 66 (1966); *Firemen's Ins. v. St. Paul Ins.,* 243 Or 10, 411 P2d 271 (1966); and *Cimarron Ins. Co. v. Travelers Ins. Co.,* 224 Or 57, 355 P2d 742 (1960).

breached its duty to the Plaintiff." The Court of Appeals affirmed.[2] *Maine Bonding & Casualty Co. v. Centennial Ins. Co.,* 64 Or App 97, 667 P2d 548 (1983). We allowed review to consider the duty, if any, owed by a primary liability insurer to an excess liability insurer.

## I
## THE INSURER'S LIABILITY TO THE INSURED

It is first appropriate to consider the nature of the relationship between a liability insurer and an insured. A liability insurance policy is a contract between the insurer and the insured containing promises by the insurer to perform specific duties.[3] Centennial's policy is typical. Among its other provisions, it contains agreements *to pay* and *to defend.* The policy provides:

> "The company will *pay* on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of A. bodily injury or B. property damage to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to *defend* any suit against the insured seeking damages on account of such bodily injury or property damage * * *." (Emphasis added.)

The policy also contains a "limits of liability" clause, which limits Centennial's duty to pay to "the limit of property damage liability stated in the declarations as applicable to 'each occurrence.'" As stated, Centennial's property damage limit is $100,000.

Centennial's policy also gives it the right to control the defense of litigation against its insured and to settle any claim or suit "as it deems expedient." The right of the insurer to control the defense of the litigation carries with it the duty to exercise diligence and care toward the insured. *Radcliffe v. Franklin Nat'l Ins. Co.,* 208 Or 1, 21, 298 P2d 1002, 1011 (1956).

---

[2] On Maine's cross-appeal, the Court of Appeals remanded for an award of attorney fees to Maine. 64 Or App at 102-03, 667 P2d at 551. The correctness of that ruling is not before us as Centennial has not sought review of that ruling.

[3] Most policies also contain provisions imposing duties on the insured. Centennial's policy contains provisions requiring the insured to give notice of an occurrence, to forward summonses, complaints and demands, and to cooperate in the conduct of suits.

In previous cases, we have held insurers liable to their insureds for failing to exercise due diligence in the defense of claims against insureds. Most claims by insureds against liability insurers involve claims that the insurer failed to exercise good faith or due care in defending claims above the limits of liability.

The common situation is one in which the policy has a limited amount available to pay claims, the claim or claims exceed the policy limits, and a judgment is returned against the insured in excess of the policy limits. On this point, *Kuzmanich v. United Fire and Casualty,* 242 Or 529, 532, 410 P2d 812, 813 (1966), states this rule:

> "An insurer owes to its insured the duty of due diligence and good faith. In determining whether to settle claims against the insured, the insurer must act as if it were liable for the entire judgment that might eventually be entered against the insured. In addition, only a decision made by an insurer who exercises due diligence in apprising itself of the material facts is entitled to be considered as made in good faith."

To the same effect is *Eastham v. Oregon Auto Ins. Co.,* 273 Or 600, 607, 540 P2d 364, 367 (1975):

> "* * * Good faith requires the insurer, in handling negotiations for settlement, to treat the conflicting interests of itself and the insured with impartiality, giving equal consideration to both interests. With respect to settlement and trial, an insurance company must, in the exercise of good faith, act as if there were no policy limits applicable to the claim and as if the risk of loss was entirely its own. Bad faith is normally demonstrated by proving that the risks of unfavorable results were out of proportion to the chances of a favorable outcome. * * *"

Although our previous decisions have referred to concepts of "good faith," "bad faith" and "due care" in stating the duty, the insurer's duty to the insured comes down to this: In conducting the defense of a claim against an insured, including the investigation, negotiation, and litigation of the claim, the insurer must use such care as would have been used by an ordinarily prudent insurer with no policy limit applicable to the claim. The insurer is negligent in failing to settle, where an opportunity to settle exists, if in choosing not to settle it would be taking an unreasonable risk — that is, a risk that would involve chances of unfavorable results out of

reasonable proportion to the chances of favorable results. Stating the rule in terms of "good faith" or "bad faith" tends to inject an inappropriate subjective element — the insurer's state of mind — into the formula. The insurer's duty is best expressed by an objective test: Did the insurer exercise due care under the circumstances.

■ The duty to defend is independent of and not limited by the duty to pay. The duty to defend requires that the insurer exercise reasonable care to protect its insured's interests, in addition to its own. This obligation may require that the insurer negotiate with a view to settling the case within the policy limits. *Eastham v. Oregon Auto Ins. Co., supra,* 273 Or at 608, 540 P2d at 368. Due care may require that an insurer make inquiries to determine if settlement is possible within the policy limits. Of course, an insurer cannot be held liable for failure to settle within the policy limits when no reasonable opportunity to settle exists.

Problems rarely arise when all claims, in the aggregate, do not exceed policy limits, because the interests of the insured and insurer are, for the most part, congruent. However, when the amount of a claim exceeds the policy limit, the interests of the insured and insurer begin to diverge because the insured alone has the responsibility to pay claims above the limits of liability. Generally, the greater the potential exposure above the policy limits, the greater the divergence between the interests of the insured and the insurer.

The duties of an insurer toward its insured are fairly well established and are not in dispute in this case. This case requires us to consider the nature of the relationship between the excess and primary insurer to determine what duty, if any, is owed by the primary liability insurer to the excess liability insurer. We turn to that question.

## II

### LIABILITY OF PRIMARY INSURER TO EXCESS INSURER

■ The purchase by an insured of a primary and an excess liability policy does not form a contractual relationship between the primary and the excess carriers. It does link them to the common insured.

One thing is clear. The excess policy is written with the existence of the primary policy in mind. Maine's policy in this case, on its declarations page, makes explicit reference to the Centennial primary coverage in a "schedule of underlying insurances." Maine's policy provides that its liability is "the excess of * * * the limits of the underlying insurances as set out in the schedule in respect of each occurrence covered by said underlying insurances." Maine's policy also contains this provision:

> "It is a condition of this policy that the policy or policies referred to in the attached 'Schedule of Underlying Insurances' shall be maintained in full effect during the currency of this policy * * *."

 One result of the primary-excess layers of coverage, such as we have in this case, is this: The excess carrier's obligation to pay begins where the primary insurer's ends — when the limits of the primary policy are exhausted. In this respect, the potential liability of the excess insurer is identical to that of an insured who has no excess coverage. The excess carrier is liable for the amount of any judgment in excess of the primary policy, up to the limits of the excess carrier's coverage. Above that amount, the insured remains liable. The result is that if the primary insurer fails to exercise due care in its handling of a claim pursuant to its obligation to defend, its default may subject the excess insurer to liability beyond the limits of the primary policy just as an insured with no excess policy is subject to personal liability for an amount in excess of the primary policy.

 Because of the close relationship between the insured, the primary insurer, and the excess insurer, and because of the exposure to liability of the excess insurer arising from the primary insurer's want of due care, it is appropriate that the excess carrier be equitably subrogated to essentially the same rights against the primary insurer as the insured would have if there were no excess coverage. In this context, the term "equitable subrogation" describes subrogation by operation of law, as opposed to conventional subrogation arising under an express or implied agreement.

 Subrogation is equitable in origin[4] and enforceable at law.

---

[4] Our research reveals that subrogation has variously been referred to as a "right,"

"Subrogation is the substitution of another person in place of the creditor to whose rights he succeeds in relation to the debt, and gives to the substitute all of the rights, priorities, remedies, liens and securities of the party for whom he is substituted. It stands upon the same broad principle of natural justice that makes one surety entitled to contribution from another, and is broad enough to cover every instance in which one party is required to pay a debt for which another is primarily answerable, and which, in equity and good conscience, ought to be discharged by the latter. It is a mode which equity adopts to compel the ultimate discharge of a debt by him who in equity and good conscience ought to pay it and relieve him whom none but the creditor could ask to pay, and where one has been compelled to pay a debt which ought to have been paid by another, he is entitled to exercise all of the remedies which the creditor possessed against the other and to indemnity from the fund out of which should have been made the payment which he has made. The right to be subrogated is not dependent upon legal assignment, nor upon contract, agreement, stipulation or privity between the parties to be affected by it; but the party who paid the debt must not be a mere volunteer. * * *"

*United States F. & G. Co. v. Bramwell,* 108 Or 261, 277, 217 P 332, 337-38 (1923).

The doctrine of equitable subrogation was discussed

---

a "remedy," a "principle," and a "doctrine." It likely developed in English equity courts because of the inadequacy of common law forms of action. This comment of Ronald C. Horn is in point:

"It is generally agreed that the doctrine of subrogation plays an important role in effecting justice through the operation of the law. Broadly speaking, subrogation is a means of placing the incidence of one party's loss or damage on the party or parties who, according to the notions of justice prevailing in our society, should bear the financial burden of the loss or damage. Since the party primarily responsible is forced to bear the ultimate financial burden of loss, he is prevented from being unjustly enriched by a discharge of the obligation on the part of a party only secondarily responsible.

"Very frequently the purposes of subrogation are said to be to prevent unjust enrichment, discourage carelessness, avoid a windfall gain to the subrogor, and so on. It seems to this writer, however, that *the* general purpose of subrogation is to facilitate placement of the financial consequences of loss on the party primarily responsible in law for such loss. Most of the other so-called purposes typically advanced are really reasons that the party breaching a duty should be held liable (and, accordingly, reasons that subrogation should be encouraged). It is the distribution of responsibility, not subrogation, which helps prevent unjust enrichment."

Horn, Subrogation in Insurance Theory and Practice 24 (1964).

in *American Central Ins. Co. v. Weller,* 106 Or 494, 502, 212 P 803, 805 (1923), as follows:

> "The doctrine of subrogation has long been an established branch of equity jurisprudence. It does not owe its origin to statute or custom, but it is a creature of courts of equity, having for its basis the doing of complete and perfect justice between the parties without regard to form. It is a doctrine which will be applied or not according to the dictates of equity and good conscience, and consideration of public policy, and will be allowed in all cases where the equities of the case demand it. It rests upon the maxim that no one should be enriched by another's loss and may be invoked wherever justice demands its application, in opposition to the technical rules of law. * * *"

In the absence of excess insurance, the insured becomes his own excess insurer. With the purchase of excess insurance, the excess insurer steps into the shoes of the insured as to the potential liability covered by the excess policy. The rationale was stated by the Supreme Court of Minnesota in *Continental Casualty Company v. Reserve Insurance Company,* 307 Minn 5, 8-9, 238 NW2d 862, 864 (1976):

> "We hold that an excess insurer is subrogated to the insured's rights against a primary insurer for breach of the primary insurer's good-faith duty to settle. See, *Peter v. Travelers Ins. Co.,* 375 F. Supp. 1347 (C.D. Cal. 1974). As one commentator has observed, 'In the case of excess coverage, the primary insurer should be held responsible to the excess insurer for improper failure to settle, since the position of the latter is analogous to that of the insured when only one insurer is involved.' R. Keeton, *Insurance Law,* § 7.8(d). When there is no excess insurer, the insured becomes his own excess insurer, and his single primary insurer owes him a duty of good faith in protecting him from an excess judgment and personal liability. If the insured purchases excess coverage, he in effect substitutes an excess insurer for himself. It follows that the excess insurer should assume the rights as well as the obligations of the insured in that position."[5]

---

[5] Courts of other states have allowed excess insurers to recover from primary insurers on theories other than equitable subrogation.

*Contractual subrogation.*

At least one court has held that the excess carrier's right of recovery against the primary carrier may be based upon the standard subrogation clause contained in most insurance contracts. *See Allstate Insurance Co. v. Reserve Insurance Co.,* 116 NH 806,

 Within the context of the instant case, the rule is this: A primary insurer owes an excess insurer essentially the same duty of due diligence in claims handling and settlement negotiating it owes to an insured—due care under all the circumstances. In considering the manner in which it will defend a claim, the primary insurer may consider its own interests, but it must also consider the interests of other parties whose interests are involved, notably, the insured and the excess insurer.

Such a rule in no way increases the duty or liability of the primary insurer. Relieving the primary insurer of its duty to diligently defend in those cases in which excess coverage and excess exposure exist may give the primary insurer a disincentive to settle.

## III
## RESOLUTION OF THIS CASE

We turn to the more specific facts of this case, examining the evidence in the light most favorable to the plaintiff to determine whether there was any evidence sufficient to warrant submission of the question to the jury. *Hemstreet v. Spears,* 282 Or 439, 441, 579 P2d 229, 231 (1978).

Following the fire, both Maine and Centennial sent investigators to the scene to investigate the cause of the loss

---

373 A2d 339 (1976). *Compare American Fidelity & Casualty Co. v. All American Bus Lines, Inc.,* 179 F2d 7 (10th Cir 1949), *reversed on other grounds,* 190 F2d 234 (10th Cir), *cert. denied,* 342 US 851 (1951).

*Direct duty.* Some courts have held that the excess carrier's right of recovery is supportable on the theory that the relationship between the primary insurer and the excess insurer gives rise to an independent duty. *See Hartford Acc. & Indem. Co. v. Michigan Mut. Ins. Co.,* 61 NY2d 569, 475 NYS2d 267, 463 NE2d 608 (1984); *Russo By Russo v. Rochford,* 123 Misc 2d 55, 472 NYS2d 954 (Sup Ct 1984).

Cases on the question of the primary insurer's liability to the excess insurer are collected in Magarick, Excess Liability 251, § 14.03 (2d ed 1982), and 1984 Supplement 70-71. Additional cases allowing recovery on an equitable subrogation theory are cited and discussed in these articles: Magarick, Excess Liability 250 (2d ed 1982); Lanzone and Ringel, *Duties of a Primary Insurer to an Excess Insurer,* 61 Neb L Rev 259, 263-69 (1982); Gallagher and German, *Resolution of Settlement Conflicts Among Insured, Primary Insurers, and Excess Insurers: Analysis of the Current State of the Law and Suggested Guidelines for the Future,* 61 Neb L Rev 284, 335-38 (1982); Note, *Primary and Excess Insurers and their Common Insured: The Triangular Relationship with No Love Lost,* 32 Case W Res 265, 291-96 (1981); Annot., *Excess Carrier's Right to Maintain Action Against Primary Liability Insurer for Wrongful Failure to Settle Claim Against Insured,* 10 ALR 4th 879, 881-87 (1981).

and the extent of the loss. In addition, the claimant, Hamilton, hired an independent public adjuster.

Maine alleged:

"Maine's loss and damage as alleged above was caused by one or more of Centennial's wrongful acts and omissions, as follows:

"1. Failure to promptly and diligently investigate and settle Hamilton's loss and claims, and failure to vigorously and in good faith defend the Hamilton litigation, whereby the insured, Great Balls of Fire, Inc., and its excess carrier, Maine, became unnecessarily exposed to potential liability for greater and additional claims, including attorney's fees, and was compelled to incur investigation and litigation related costs and expenses."

There was never any real doubt that the total damages exceeded the amount of Centennial's coverage. There is evidence that suggests that Centennial's investigation was not as thorough as it might have been and that it made little or no effort to attempt to negotiate a settlement shortly after the fire. Hamilton and his attorney both testified that the case could have been settled for as little as $227,000 during the first few months after the fire, although no such offer was ever made or communicated by Hamilton or his attorney to Centennial.

A liability insurer is not necessarily free from excess liability because the claimant made no offer to settle within the policy limits. Due care may require an insurer to institute settlement negotiations. The insurer's conduct in conducting settlement negotations "must be considered with reference to the context in which the failure or delay occurs." *Eastham v. Oregon Auto Ins. Co., supra,* 273 Or at 608, 540 P2d at 368.

The trial court characterized Maine's case as "weak." We agree. We nonetheless believe that there was sufficient evidence from which the jury could have found that Centennial's investigation, negotiation, or defense of the claim was inadequate. There is evidence from which the trier of fact could have found that had Centennial instituted settlement discussions, it would have learned that the case could have been settled for $227,000. The trier of fact could have found that the failure to do so was negligence. The evidence suggests that, with the passage of time, Hamilton became antagonistic

by reason of the delay and lack of attention to the claim, suffered greater difficulty in running his business and came to insist upon a higher settlement figure than he would have if the claim had been handled more expeditiously.

In defending cases, liability insurers are required to act as if they are liable for the entire judgment that might be returned. Under the facts, a jury could have found that Centennial did not do so. The decision of the Court of Appeals is affirmed. Remanded to the trial court for further proceedings in accordance with the decision of the Court of Appeals.