ARMSTRONG, P. J.
*791 Plaintiff Oregon Mutual Insurance Company (Oregon Mutual) brought this contribution action against defendant Those Certain Underwriters at Lloyd's London Subscribing to Policy Number OROAKG2-CNE (Lloyd's), asserting that Lloyd's was responsible as a co-insurer to pay a pro-rata share of the total amount paid to settle an automobile accident. On cross-motions for summary judgment, the trial court granted summary judgment to Lloyd's, and Oregon Mutual appeals. The question presented on appeal is whether the policy sold by Lloyd's is an excess liability policy under ORS 742.468(2), which provides an exemption for such policies from the Financial Responsibility Law (FRL), ORS 806.010 to 806.300. We conclude that the Lloyd's policy was an excess liability policy and, hence, the trial court did not err. Accordingly, we affirm.
The facts relevant to the appeal are undisputed. RSVP-SCP of Clackamas County (RSVP) is a nonprofit organization that, among other things, coordinates the work of volunteers to transport people to medical appointments. Schabert, a "registered volunteer" for RSVP, was acting in that capacity for RSVP when she arrived in her own vehicle at Saint's home to transport Saint to a medical appointment. As Saint was getting into Schabert's car, Saint slipped, fell, and fractured her leg. Saint released her claims against Schabert for a payment of $180,000.
Oregon Mutual, which provided a primary automobile insurance policy to Schabert, paid the first $100,000 of the settlement, which was the whole of the per-occurrence limit in Schabert's policy. Lloyd's, which provided a "volunteer excess auto liability" insurance policy for RSVP's "registered volunteers," paid the remaining $80,000 of the settlement.
The Lloyd's policy provided two types of "volunteer excess liability" coverage to registered volunteers of RSVP, who were the "insured" under the policy. RSVP, itself, was not an insured under the policy. Because only the "volunteer excess auto liability" coverage is at issue in this case, we recite only the portions of the policy relevant to that coverage. That coverage provided:
*792 "Volunteer Excess Auto Liability. We will pay all sums in excess of the 'retained limit' that the insured becomes legally obligated to pay as damages because of 'Bodily injury', 'property damage' or 'personal injury' to which this insurance applies. The amount we will pay is limited as described in SECTION III-LIMITS OF INSURANCE."
The excess auto liability coverage had a $500,000 per accident limit and applied to "bodily injury," "property damage," or "personal injury" arising out of "the insured's volunteer service on behalf of [RSVP]" and caused by an "accident under the volunteer excess auto liability." The policy defined "retained limit" as
"the greater of:
"1. An amount equal to the applicable limits of insurance of any other insurance collectible by the insured; or
"2. An amount equal to the minimum limit of insurance required under the motor vehicle financial responsibility law of the state or province in which the 'accident' occurs or $50,000 or whichever is less."
The policy also had an exclusion for "[a]ny obligation under any uninsured or underinsured motorists law, 'no-fault' law, basic reparations benefit law, and any law requiring personal injury protection coverage, or any *234 similar law." RSVP paid an annual premium of $513 for the Lloyd's policy. In contrast, Schabert paid an annual premium of $803 for the Oregon Mutual primary policy to cover her one vehicle.
Oregon Mutual brought this contribution lawsuit against Lloyd's, arguing that Lloyd's was a co-insurer, and not an excess insurer, that was responsible to pay a full pro-rata share of the settlement amount, under the doctrine set out in Lamb-Weston, Inc. v. Ore. Auto. Ins. Co. , 219 Or. 110, 341 P.2d 110, reh'g den. , 219 Or. 130, 346 P.2d 643 (1959).[1]
*793 Lloyd's argued that the policy that it provided to RSVP was an excess liability policy that is not subject to the Lamb-Weston doctrine. See Liberty Mut. Ins. v. Truck Ins. , 245 Or. 30, 36-37, 420 P.2d 66 (1966) (excess carriers are not required under Lamb-Weston to pay part of loss before first layer of coverage is exhausted). The trial court agreed with Lloyd's, concluding that the Lloyd's policy was an excess liability policy. The court accordingly granted Lloyd's motion for summary judgment and denied Oregon Mutual's motion for summary judgment. On appeal, Oregon Mutual assigns error to both of those rulings.
"When, as here, the facts are not in dispute, we review rulings on cross-motions for summary judgment to determine whether either party is entitled to judgment as a matter of law." Busch v. Farmington Centers Beaverton , 203 Or. App. 349, 352, 124 P.3d 1282 (2005), rev. den. , 341 Or. 216, 140 P.3d 1133 (2006). The issue presented in this appeal is a purely legal question.
On appeal, Oregon Mutual reprises the arguments that it made below. The chain of Oregon Mutual's argument is that ORS 742.450(2) requires every automobile liability insurance policy to meet the requirements of the FRL.[2] "Excess liability policies" are exempt from those requirements, under ORS 742.468(2).[3] Because Oregon Mutual concludes, as set out below, that the Lloyd's policy cannot be an excess policy, it also concludes that the Lloyd's policy must *794 be construed to be a primary policy as required by the FRL, and, in turn, subject to the Lamb-Weston doctrine. Thus, for purposes of this appeal, the question we must answer is whether the Lloyd's policy qualifies as an exempt excess liability policy under ORS 742.468(2).
As to that question, Oregon Mutual relies on Hanson v. St. Paul Fire and Marine Ins. Co. , No. CV 10-1161-PK, 2011 WL 1086528 (D. Or. Mar. 22, 2011), an unpublished Oregon federal district court case that examined the meaning of "excess liability policies" in ORS 742.468, and concluded that that exemption applies only to "true" excess policies. Oregon Mutual argues that, based on the discussion in Hanson , to be a "true" excess policy, a policy must meet three conditions: (1) the policy must be written with the underlying primary policy in mind and acknowledge the underlying policy; (2) the policy *235 must require maintenance of the underlying policy and identify its specific limits; and (3) the policy must be purchased and maintained by the same insured that holds the underlying primary policy. See id . at *12-13 (applying those features to the policy at issue in that case to determine if it was a "true" excess policy). Because the Lloyd's policy does not have any of those three features, Oregon Mutual concludes that it is not an excess liability policy under ORS 742.468.
Lloyd's responds that the policy that it issued to RSVP to cover its registered volunteers is a "true" excess liability policy. Lloyd's asserts that what constitutes an excess liability policy should be governed by the intention of the contracting parties, based on the terms and conditions of the policy. Here, Lloyd's argues, those terms and conditions show that Lloyd's intended to sell and RSVP intended to purchase excess insurance. In particular, Lloyd's points out that the policy does not provide for any "first-dollar" coverage-viz. , it only covers damages in excess of the limits of the underlying policy or, if there is no such policy, damages in excess of the minimum coverage requirements of the FRL-and the policy has a relatively low premium, $513, for a relatively high limit, $500,000. Lloyd's notes that the features of an excess policy discussed in Hanson -features primarily related to identifying a specific underlying primary policy-do not apply here for practical reasons, given the nature of covering volunteers, but argues that that fact *795 does not convert the policy into a primary policy that neither Lloyd's nor RSVP intended.
We begin our analysis by rejecting Oregon Mutual's reliance on Hanson , a nonbinding federal district court case. In Hanson , the court relied on an Oregon Supreme Court case, Maine Bonding v. Centennial Ins. Co. , 298 Or. 514, 693 P.2d 1296 (1985), as a source to identify what the legislature would have understood is required for an excess liability policy. Hanson , No. CV 10-1161-PK, *7-9. However, that reliance by the Hanson court was misplaced. Maine Bonding was not a case in which identifying the necessary characteristics of an excess liability policy was in any way at issue. See Hoffman Construction Co. v. Fred S. James and Co. , 313 Or. 464, 473 n. 5, 836 P.2d 703 (1992) (rejecting a party's reliance on generalized statements about excess insurance in Maine Bonding because that case presented a different issue).
The issue in Maine Bonding was whether a primary insurer owed a duty of care to an excess insurer that had insured the same loss. In examining that issue, the court in Maine Bonding merely stated that the excess policy in that case was a "classic" excess liability policy, such that no issue under Lamb-Weston was implicated. Maine Bonding , 298 Or. at 516 n. 1, 693 P.2d 1296. The court, in setting out the relevant facts to address the issue that was presented, also revealed some of the excess liability policy's terms and conditions and the fact that the insured had purchased both the underlying primary policy and the excess policy. Id. at 516, 520, 693 P.2d 1296. That the excess liability policy in Maine Bonding happened to have the features outlined by the Hanson court, and relied on by Oregon Mutual, does not suggest that the legislature would have intended that "excess liability policies" under ORS 742.468(2) are required to have those features to qualify for the exemption under that statute.
Having rejected Hanson as a guide for our interpretation of ORS 742.468(2), we turn to construing the term "excess liability policies" as used in that statute. In doing so, we employ our usual methodology to determine the legislature's intention in enacting a statute by looking at the text of the statute in context, along with any useful legislative history. State v. Gaines , 346 Or. 160, 171-72, 206 P.3d 1042 (2009).
*796 As noted above, ORS 742.468 exempts three types of liability policies from being considered motor vehicle liability policies for purposes of "statutes mandating kinds or amounts of coverage that motor vehicle liability policies must contain." Those three types are "(1) [c]omprehensive general liability policies," "(2) [e]xcess liability policies," and "(3) [u]mbrella liability policies." ORS 742.468. The statute does not define "excess liability policies;" thus, we apply the plain meaning of that term. In this case, the plain meaning is *236 the one commonly understood in the context of insurance contracts. See, e.g. , State v. Gonzalez-Valenzuela , 358 Or. 451, 461-62, 365 P.3d 116 (2015) (explaining the importance of construing the plain meaning of statutory text in the context of the statute itself; "nuanced connotations may represent the plain meaning of a term in context even though those connotations result from tacit knowledge, accumulated experience, and common sense that are not reflected well-if at all-in dictionary definitions"). We have previously touched upon that meaning in our case law.
In Hoffman Construction Co. , the Supreme Court described three "tiers" of insurance-primary, excess, and umbrella:
"Liability insurance policies frequently are arranged in tiers, with each level of policy designed to 'kick in' when the coverage provided by the lower level of insurance is exhausted. The general nomenclature surrounding this phenomenon labels an insured's basic insurance as the 'primary' insurance, the insured's next level of insurance (that covers risks involving amounts in excess of the primary insurance) as 'excess' insurance, and the insured's final level of insurance (that covers risks only after and to the extent that lower levels do not) as 'umbrella' insurance."
313 Or. at 466 n. 1, 836 P.2d 703 (citing Annotation, Primary Insurer's Insolvency as Affecting Excess Insurer's Liability , 85 ALR 4th 729, 735-36 (1991) ). See also Ind. Finishes & Systems v. Am. Univ. Ins. , 79 Or. App. 614, 618, 720 P.2d 382, adh'd to as modified on recons. , 80 Or. App. 743, 724 P.2d 333 (1986) ("Primary insurance coverage is provided when, under the terms of the policy, liability attaches immediately upon the happening of an occurrence that gives rise to liability, as opposed to excess or secondary coverage, which attaches *797 only after a predetermined amount of primary coverage has been exhausted."). Excess liability policies also have lower relative premiums and higher relative limits than primary policies, in light of the more remote risk of having to pay under the policy. See, e.g. , Liberty Mut. Ins. , 245 Or. at 35, 420 P.2d 66 (so recognizing with respect to the excess policy in that case). That understanding of excess liability coverage is supported by treatises on insurance law.[4] As commonly understood in the *237 insurance context, an excess liability policy is one that *798 provides a specific amount of coverage above an underlying limit of primary insurance, but does not expand the scope of that coverage, viz. , the policy typically will not "drop down" to provide any first-dollar coverage, regardless of whether the insured maintains the primary insurance. See Douglas R. Richmond, 4 New Appleman on Insurance Law Library Edition § 24.02 (2018).
The "true" excess liability policy, described above, is different from a primary policy with an excess "other insurance" clause. An excess "other insurance" clause is a clause that provides that, if other insurance is available to cover the same loss, then the policy will provide only "excess" insurance over the other available insurance. When the legislature enacted ORS 742.468 it had long been understood that a primary policy with an excess "other insurance" clause was not an excess liability policy, but a primary policy. See Maine Bonding , 298 Or. at 516 n. 1, 693 P.2d 1296 (noting that distinction); Ind. Finishes & Systems , 79 Or. App. at 619, 720 P.2d 382 (policy was primary when, in the absence of other insurance, it provided coverage for the entire loss); see also Richmond, 4 Appleman on Insurance Law Library Edition § 24.07[3][b] ("Excess and umbrella policies clearly differ in purpose from primary policies containing excess 'other insurance' clauses[.] * * * Excess and umbrella policies are therefore regarded as true excess coverage over and above all primary policies, including those with excess 'other insurance' clauses."). Thus, whether a policy is an excess liability policy, as that term is commonly understood, turns on the type of coverage that the policy provides, viz. , is that coverage "truly" excess and does not provide first-dollar coverage, as described above, or is it primary insurance that purports to be excess only under certain circumstances. That determination turns on the particular policy at issue.
*799 For purposes of ORS 742.468, there is no indication from the text, context, or legislative history that the legislature would have intended the term "excess liability policies" to mean anything different or more restrictive from how that term is commonly understood and has been discussed in our case law. We decline to adopt a particular "test," such as advocated by Oregon Mutual, for determining whether a policy is a "true" excess liability policy because such policies may be written any number of ways, with different obligations on the insured. The defining feature of a "true" excess liability policy, however, is to provide coverage to an insured that can only ever "kick in" above the limits of primary coverage. Although the features that Oregon Mutual describes may be useful in determining whether a policy is an excess liability policy in a particular case, those features are not required for a policy to be an excess liability policy under ORS 742.468.
Turning to the facts of this case, the Lloyd's policy is an excess liability policy under ORS 742.468(2). As set out above, the Lloyd's "volunteer excess auto liability" coverage only pays sums in "excess" of the "retained limit." In turn, the "retained limit" is the greater of (1) the limits of the insured's collectible insurance or (2) the minimum limit of insurance required by the FRL. The policy also expressly states that the coverage is not for the purpose of meeting any statutory minimum requirements by both setting the floor for the retained limit at the required minimum statutory requirement and by expressly excluding coverage for such statutory requirements. Thus, the policy provides no primary coverage and does not have any "drop down" to provide such coverage. The Lloyd's policy provides only the coverage that excess liability policies are commonly *238 understood to provide; in contrast, the policy has no features of a primary policy with an excess "other insurance" clause.[5] In addition, the Lloyd's policy had a relatively low premium and high limit-a common feature of a "true" excess liability policy. Because the Lloyd's policy was an excess liability *800 policy under ORS 742.468(2), it is not subject to the requirements of the FRL.
Accordingly, the trial court did not err in granting summary judgment to Lloyd's.
Affirmed.

The Lamb-Weston doctrine provides that,
"if two or more insurers provide coverage for the same loss, and each attempts to limit the extent of its liability when there is other applicable insurance, if the respective 'other insurance' clauses purport to limit or preclude coverage on the basis of the existence of other coverage, then those clauses are disregarded and the liability of the individual insurers is prorated in the ratio that their respective policy limits bear to the cumulative limit of all of the applicable policies."
Ind. Finishes & Systems v. Amer. Univ. Ins. , 79 Or. App. 614, 616-17, 720 P.2d 382, adh'd to as modified on recons. , 80 Or. App. 743, 724 P.2d 333 (1986).

ORS 742.450(2) provides:
"Every motor vehicle liability insurance policy issued for delivery in this state shall contain an agreement or indorsement stating that, as respects bodily injury and death or property damage, or both, the insurance provides either:
"(a) The coverage described in ORS 806.070 and 806.080 ; or
"(b) The coverage described in ORS 806.270."
The FRL, ORS 806.010 to 806.300, requires automobile policies to cover the minimum limits of coverage provided in the FRL. See ORS 806.080 ; ORS 806.270.

ORS 742.468 provides:
"For purposes of statutes mandating kinds or amounts of coverage that motor vehicle liability policies must contain, the following shall not be considered motor vehicle liability policies:
"(1) Comprehensive general liability policies.
"(2) Excess liability policies.
"(3) Umbrella liability policies."

For example, Couch on Insurance describes the insurance "levels" as follows:
"The first to kick in is the primary policy which covers any loss over a small deductible, has a relatively small maximum coverage, and requires relatively high premiums, since almost any covered loss will require the insurer to make some payment. The next level of insurance, pure 'excess' insurance, commonly kicks in at the maximum coverage under the primary policy, has a high maximum policy limit, and is purchased with relatively small premiums, since most covered losses will not reach the level at which the policy kicks in, hence the insurer expects to make payments seldom, if at all. A third level may exist, ordinarily consisting of another type of excess insurance commonly called 'umbrella' coverage, which kicks in at the upper limit of the first excess policy and has upper limits of its own that are higher than most insureds will ever need. Since the insurer will rarely be called upon to make payments under such a policy, the premiums are even lower than those for the excess insurance."
Steven Plitt et al. , 1 Couch on Insurance § 6:35 (3rd ed. 2018) (footnotes omitted; emphasis added).
The New Appleman on Insurance Law Library Edition describes in more detail the three "layers" of insurance as follows:
"A primary policy provides the first layer of insurance coverage. Primary coverage attaches immediately upon the happening of an 'occurrence,' or as soon as a claim is made. The primary insurer is responsible in the first instance for defending and indemnifying the insured in the event of a covered or potentially covered occurrence or claim. Because primary insurers are generally obligated to defend their insureds and most losses will fall within the primary policy limits, primary insurers bear a greater risk and charge larger premiums than do excess and umbrella carriers. In contrast, relieved of primary insurance burdens, excess insurers charge relatively low premiums when compared to the amount of risk insured. * * *
"* * * * *
"An excess policy provides specific coverage above an underlying limit of primary insurance. A true excess policy does not broaden the underlying coverage. While an excess policy increases the amount of coverage available to compensate for a loss, it does not increase the scope of coverage. * * *
"* * * * *
"Many excess policies provide that an insured's failure to maintain its primary coverage will not invalidate the excess policy, but that the excess insurer will only be liable to the same extent that it would have been had the insured maintained the underlying coverage. * * *
"* * * * *
"An umbrella policy is similar to an excess policy in that it protects the insured against liability for catastrophic losses that would exceed the limits of affordable primary coverage. * * * An umbrella policy differs from an excess policy in a critical aspect: an umbrella policy typically insures against certain risks that a concurrent primary policy does not cover. * * * By dropping down to fill a gap in primary coverage, an umbrella policy broadens the insured's primary coverage whereas an excess policy does not."
Douglas R. Richmond, 4 New Appleman on Insurance Law Library Edition § 24.02 (2018) (footnotes omitted; emphases in original).

We acknowledge that the Lloyd's policy also has an excess "other insurance" clause. However, that clause only applied to amounts over the "retained limit" covered by other insurance. The existence of that clause had no effect on the character of the Lloyd's policy, which is an excess liability policy.