142 Nev., Advance Opinion 7

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| NORTH RIVER INSURANCE COMPANY, A NEW JERSEY CORPORATION, Appellant, vs. JAMES RIVER INSURANCE COMPANY, AN OHIO CORPORATION, Respondent. | No. 89228 <br><br> **FILED** <br><br> JAN 29 2026 <br> ELIZABETH A. BROWN <br> CLERK OF SUPREME COURT <br> BY_____ <br> CHIEF DEPUTY CLERK |



Certified question from the United States Court of Appeals for the Ninth Circuit concerning an excess insurer's ability to claim equitable subrogation against a primary insurer.

*Question answered.*

O'Melveny & Myers LLP and Anton Metlitsky, New York, New York, and Sabrina H. Strong, Zoheb P. Noorani, and Jessica A. Snyder, Los Angeles, California; Campbell & Williams and J. Colby Williams, Las Vegas, for Appellant.

Holland & Hart LLP and Abraham G. Smith and Lauren D. Wigginton, Las Vegas; Sheppard, Mullin, Richter & Hampton LLP and Jeffrey V. Commisso and Benjamin D. Brooks, San Diego, California, for Respondent.

BEFORE THE SUPREME COURT, EN BANC.

26-04442

*OPINION*

By the Court, HERNDON, C.J.:

Pending in the Ninth Circuit Court of Appeals is a suit brought by appellant North River Insurance Company against respondent James River Insurance Company for equitable subrogation. North River, an excess insurer, and James River, the primary insurer, issued liability insurance to their mutual insured. Following a lawsuit against the insured, James River agreed to defend the suit. The suit eventually settled before trial but not before James River declined three settlement offers at or below its policy limit. Because the ultimate settlement exceeded James River's policy limit, both insurers funded the settlement: James River contributed its policy amount and North River funded the remaining portion, under protest. North River sued James River in California federal court for equitable subrogation, arguing that James River breached its duty of good faith and fair dealing by refusing to settle within its policy limits, such that North River could stand in the shoes of its insured and seek recovery. Applying Nevada law, the federal court determined that two unpublished decisions from this court barred North River's claim.

On appeal, the Ninth Circuit concluded that Nevada has no clearly controlling precedent and certified the following question to this court pursuant to NRAP 5: Under Nevada law, can an excess insurer state a claim for equitable subrogation against a primary insurer where the underlying lawsuit settled within the combined policy limits of the insurers? We answer the question in the affirmative and conclude that an excess insurer may state a claim for equitable subrogation against a primary insurer when the insured would have suffered loss absent the excess

(O) 1947A

insurer's discharge of the liability, regardless of whether the suit settled within the combined policy limits of the insurers.

## FACTS AND PROCEDURAL HISTORY

Primary insurer James River issued a $1 million commercial general liability insurance policy to nonparty L.A. Pacific Center Inc. in Monrovia, California. The policy identified Alhambra Place as an additional named insured and listed Shelter Island Apartments located in Las Vegas as an insured location. Excess insurer North River issued a $10 million excess insurance policy to L.A. Pacific Center, which also listed Alhambra Place as an additional named insured and Shelter Island as an insured location. Both policies were in effect from March 1, 2017, to March 1, 2018.

On May 27, 2017, an individual was fatally shot in a unit located inside of the Shelter Island Apartments. The coadministrators of the decedent's estate filed a complaint in Nevada state court against Alhambra Place, alleging negligence, gross negligence, wrongful death, and negligent hiring, supervision, and training. Upon timely notice of the complaint, James River agreed to defend Alhambra Place and retained counsel.

In March 2019, the coadministrators of the estate issued a $1 million settlement demand to James River. Thereafter, the coadministrators tendered two settlement offers below James River's policy limit: $990,000 (May 2021) and $975,000 (November 2021). James River did not accept any of these settlement offers. On August 30, 2022, the coadministrators increased their settlement demand to $5 million, and on November 30, 2022, the case settled for $5 million. James River contributed its policy limit of $1 million, and North River contributed $4 million of its

$10 million excess policy. North River made its contribution under protest, reserving its rights to seek reimbursement.

In January 2023, North River sued James River in California federal court for equitable subrogation, seeking $4 million in compensation. North River alleged that James River's failure to settle the underlying suit within its policy limits breached its duty of good faith and fair dealing. North River contended that Alhambra Place had an existing and assignable cause of action against James River for its failure to settle, which Alhambra Place could have asserted but for North River's payment on its behalf to settle the suit. North River alleged that by virtue of its payment to settle the suit, it was subrogated to the rights of Alhambra Place against James River and could stand in Alhambra Place's shoes to recover its $4 million settlement payment from James River under the doctrine of equitable subrogation.

James River moved to dismiss. James River argued that under this court's decision in *St. Paul Fire & Marine Insurance Co. v. National Union Fire Insurance Co. of Pittsburgh, Pennsylvania*, No. 81344, 2022 WL 17543613 (Nev. Dec. 8, 2022) (Order of Affirmance), North River had no claim to equitable subrogation because the underlying suit settled within the combined policy limits. The federal district court agreed. *N. River Ins. Co. v. James River Ins. Co.*, No. cv 23-00027-PSG-E, 2023 WL 5699125 (C.D. Cal. Aug. 4, 2023) (Order Granting Defendant's Motion to Dismiss Without Leave to Amend). The district court first undertook a conflict of laws analysis, finding that Nevada and California materially conflict regarding equitable subrogation. *Id.* at *3. The court concluded that Nevada substantive law would apply because the nature of the policy, Shelter

Island's location, and the location of the underlying litigation favored Nevada's interest in having its law applied to the dispute. *Id.* at *5.

The federal court found that while Nevada has recognized the doctrine of equitable subrogation, it "has not issued a binding decision addressing whether it would recognize equitable subrogation in the context of two insurance companies and, if so, what an insurer claiming subrogation would have to prove." *Id.* The court reasoned that it was required to predict how this court would resolve the dispute and, therefore, even though *St. Paul* and *Aspen Specialty Insurance Co. v. Eighth Judicial District Court*, No. 83794, 2023 WL 3185274 (Nev. Apr. 28, 2023) (Order Granting Petition for Writ of Mandamus), concerned motions for summary judgment rather than motions to dismiss, the court would follow the logic from *St. Paul* and *Aspen*. *Id.* at *6. Relying on these cases, the court granted James River's motion to dismiss, reasoning that the underlying suit settled within policy limits, meaning there were no damages that North River could assert on behalf of its insured. *Id.* The court found that North River's equitable subrogation claim was barred under Nevada law. *Id.*

North River appealed to the Ninth Circuit Court of Appeals. After briefing and oral argument, the Ninth Circuit issued an order certifying a question to this court. *N. River Ins. Co. v. James River Ins. Co.*, 116 F.4th 855 (9th Cir. 2024). The Ninth Circuit found that this case raised "important policy ramifications implicating insurance companies, their underlying duties to make reasonable settlement decisions, and their ability to subrogate claims after the payment of settlement fees" such that Nevada would have an interest in regulating its own insurance landscape. *Id.* at 858. Applying a conflict of laws analysis, the Ninth Circuit reasoned that it must determine whether a material difference between Nevada and

California law exists. *Id.* at 859. That is, the court had to determine whether Nevada law permits or prohibits equitable subrogation claims by an excess insurer against a primary insurer when the underlying settlement is within the insurers' combined policy limits because California permits such claims. *Id.* The court determined that "[u]nder the current state of Nevada law, it is not clear whether Nevada recognizes a claim for equitable subrogation in these circumstances." *Id.*

The Ninth Circuit determined that *St. Paul* and *Aspen* were not dispositive to this case because both decisions were unpublished; therefore, neither established mandatory precedent and had "no compulsory binding effect on this case." *Id.* at 860. The court also noted that "neither case was decided by the full Nevada Supreme Court." *Id.* And the court reasoned that there are "meaningful differences between" the instant case and *St. Paul* and *Aspen* because those cases involved a settlement negotiation after a jury verdict but before the punitive damages phase of trial, as opposed to the pretrial settlement at issue here, and because "the present appeal arose from the grant of a . . . motion to dismiss, before any discovery was conducted, whereas *St. Paul* arose from the grant of summary judgment, after the close of discovery." *Id.*

Therefore, the Ninth Circuit concluded that it was "[l]eft with no clearly controlling precedent" and that this court should be the first to determine whether equitable subrogation is permitted between two insurers in this context. *Id.* The Ninth Circuit thus certified a question to this court: Under Nevada law, can an excess insurer state a claim for equitable subrogation against a primary insurer where the underlying lawsuit settled within the combined policy limits of the insurers? *Id.* at 857.

## DISCUSSION

*We elect to answer the certified question*

This court may answer certified questions of Nevada law from a federal appellate court when there exists no controlling authority regarding the question of law and such questions are determinative of the case pending in the certifying court. NRAP 5(a). "A certified question under NRAP 5 presents a pure question of law, which this court answers de novo." *Echeverria v. State*, 137 Nev. 486, 488, 495 P.3d 471, 474 (2021). This court accepts the "facts as stated in the certification order and its attachments" and is "limited to answering the question of law posed[.]" *In re Fountainebleau Las Vegas Holdings*, 127 Nev. 941, 955-56, 267 P.3d 786, 794-95 (2011). "Nevertheless, this court retains the discretion to rephrase the certified questions" as it deems necessary. *Echeverria*, 137 Nev. at 488-89, 495 P.3d at 474. Though the need for further factual and legal development does not render this court's answer to a certified question impermissibly advisory, this court declines to answer certified questions when an answer would be insufficiently outcome-determinative to satisfy NRAP 5, such as where Nevada law may not resolve the case without further proceedings. *Parsons v. Colts Mfg. Co. LLC*, 137 Nev. 698, 702-03, 499 P.3d 602, 606 (2021).

On October 10, 2024, we accepted the certified question and directed briefing. *N. River. Ins. Co. v. James River Ins. Co.*, No. 89228 (Nev. Oct. 10, 2024) (Order Accepting Certified Question, Directing Briefing and Directing Submission of Filing Fee). We determined that there was no controlling Nevada precedent that existed on this legal question and that the answer may determine part of the federal case. *Id.* We are unpersuaded by James River's various arguments against answering the certified question and find no reason to depart from our earlier conclusion. As we

previously opined, there exists no *controlling* authority under our caselaw that would resolve the dispute pending in the certifying court. *See* NRAP 5(a). While we have issued unpublished orders in cases with equitable subrogation claims involving primary and excess insurers, *see, e.g., St. Paul*, No. 81344, 2022 WL 17543613 (Nev. Dec. 8, 2022) (Order of Affirmance); *Aspen*, No. 83794, 2023 WL 3185274 (Nev. Apr. 28, 2023) (Order Granting Petition for Writ of Mandamus), those cases are not binding precedent. *See* NRAP 36(c)(2). We further recognize that in order to resolve the dispute in the certifying court, that court must undertake a choice-of-law analysis; the federal court cannot meaningfully do so without knowing Nevada's law on this issue. We thus take this opportunity to clarify our caselaw by resolving the question certified to us by the Ninth Circuit.

*North River may pursue reimbursement under the doctrine of equitable subrogation*

North River argues that under existing Nevada law, an insurer can assert an equitable subrogation claim against a third party where its insured has an independent basis to recover from the third party for a loss and the insured would have been required to pay the loss had the insurer not done so. It argues that nothing in Nevada law supports a different outcome simply because the third-party wrongdoer happens to be another insurer. James River argues that an excess insurer may only state a claim for equitable subrogation from a primary insurer when (1) the insured is exposed to an excess judgment before settlement, (2) the primary insurer refuses to pay its portion of a settlement, or (3) the insured incurs defense costs because a primary insurer breaches its duty to defend the insured. James River argues under the facts of this case—where the primary insurer defended the insured and an in-policy-limits settlement was reached, the

SUPREME COURT
OF
NEVADA

(O) 1947A

8

insured suffered no damages, and the insured received the benefit of the bargains between both insurers—there is no claim to be subrogated.

Nevada has recognized the doctrine of equitable subrogation in various contexts. *See In re Fountainebleau Las Vegas Holdings*, 128 Nev. 556, 580 & n.8, 289 P.3d 1199, 1214 & n.8 (2012) (collecting cases regarding the doctrine as it pertains to workers' compensation, negotiable instruments, surety, and mortgages). "Subrogation applies when one party, the subrogee, involuntarily pays the obligation or loss of another, the subrogor, for which a third party, wrongdoer, or otherwise is eventually found to bear responsibility." *St. Paul*, 2022 WL 17543613, at *2 (citing *AT & T Techs., Inc. v. Reid*, 109 Nev. 592, 595-96, 855 P.2d 533, 535 (1993)). Subrogation creates derivative rights. *See Arguello v. Sunset Station, Inc.*, 127 Nev. 365, 368, 252 P.3d 206, 208 (2011). Thus, the rights of an excess insurer are coequal to those of an insured, and the excess insurer "cannot acquire anything by subrogation to which the insured has no right and can claim no right the insured does not have." *RLI Ins. Co. v. CNA Cas. of Cal.*, 45 Cal. Rptr. 3d 667, 671 (Ct. App. 2006) (quoting *United Servs. Auto. Ass'n v. Alaska Ins. Co.*, 114 Cal. Rptr. 2d 449, 454 (Ct. App. 2001)). In this way, the excess insurer is said to "stand in the shoes" of the insured and is "permitted to assert all claims against the primary carrier which the insured himself could have asserted." *St. Paul Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 353 P.3d 991, 995-96 (Haw. 2015); *see also Valley Power Co. v. Toiyabe Supply Co.*, 80 Nev. 458, 460, 396 P.2d 137, 138 (1964) (permitting the insurer who compensated the insured in full to pursue an equitable subrogation claim against a third-party tortfeasor for any claims the insured would have had against the tortfeasor before any payments were made).

SUPREME COURT
OF
NEVADA

(O) 1947A

9

An insurance company is required to "effectuate prompt, fair and equitable settlements of claims in which liability of the insurer has become reasonably clear." NRS 686A.310(1)(e). Thus, Nevada allows for the insured to pursue bad faith claims against its insurer for failure to settle when harm results from the breach. *Cf. Allstate Ins. Co. v. Miller*, 125 Nev. 300, 311, 212 P.3d 318, 325-26 (2009) (expanding the insurer's liability for bad faith claims beyond a timely offer within policy limits); *see also Peter v. Travelers Ins. Co.*, 375 F. Supp. 1347, 1349 (C.D. Cal. 1974) (explaining that "in every contract, there is an implied covenant of good faith and fair dealing that neither party will do anything which will injure the right of the other to receive the benefits of the agreement and . . . this implied obligation requires an insurer to settle in an appropriate case" even if "the express terms of a particular policy do not impose this duty"). An insurer's breach of the duty of good faith and fair dealing subjects the insurer to liability for all damages caused by the breach. *Allstate Ins. Co.*, 125 Nev. at 314, 212 P.3d at 327-28.

Many jurisdictions have held that an excess insurer that contributes to a settlement can pursue reimbursement from the primary insurer for failure to accept a reasonable settlement offer within primary policy limits. *See, e.g., Liberty Mut.*, 353 P.3d at 998 ("[W]e hold that an excess liability insurer can bring a cause of action, under the doctrine of equitable subrogation, against a primary liability insurer who in bad faith fails to settle a claim within the limits of the primary liability policy, when the primary insurer has paid its policy limit toward settlement."); *Ace Am. Ins. Co. v. Fireman's Fund Ins. Co.*, 206 Cal. Rptr. 3d 176, 195 (Ct. App. 2016) ("[W]here the . . . excess insurer has actually contributed to the excess settlement, the [excess insurer] may allege that the primary insurer's

SUPREME COURT
OF
NEVADA

(O) 1947A

10

breach of the duty to accept reasonable settlement offers resulted in damages in the form of the excess settlement."); *Scottsdale Ins. Co. v. Addison Ins. Co.*, 448 S.W.3d 818, 832 (Mo. 2014) ("Regardless of the existence of an excess insurer, a primary insurer should be held liable when it acts in bad faith in refusing to settle within its policy limits. Therefore, [the excess insurer] as the party that actually paid the loss . . . should be equitably subrogated [to the rights of the insured]."); *Am. Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480, 483 (Tex. 1992) (holding that where the underlying suit settled in excess of primary policy limits, "an excess carrier may bring an equitable subrogation action against the primary carrier"); *Me. Bonding & Cas. Co. v. Centennial Ins. Co.*, 693 P.2d 1296, 1303 (Or. 1985) (permitting the excess insurer to bring an equitable subrogation claim against the primary insurer after a settlement when the primary insurer's "investigation, negotiation, or defense of the claim was inadequate").

We agree with the reasoning by these courts and hold that an excess insurer that pays toward a settlement against its insured may pursue reimbursement from the primary insurer for the primary insurer's failure to accept a reasonable settlement offer within the primary insurer's policy limits. Specifically, we conclude that equitable subrogation allows the excess insurer to stand in the shoes of the insured and assert all claims against the primary insurer that the insured itself could have asserted. Thus, if the insured could have sued the primary insurer for failure to reasonably settle, the excess insurer who discharged the insured's liability can too. Applying these principles here, we note had North River *not* paid $4 million towards the $5 million settlement, Alhambra Place would have been liable for that amount. Alhambra Place, in turn, could have sued

James River for breach of its duty to settle within its $1 million policy limit and sought to recoup the full $4 million that was in excess of its primary policy limit. Accordingly, North River may seek equitable subrogation. As subrogee, North River stands in the *exact same shoes* as the subrogor, Alhambra Place, and can assert all claims against James River that Alhambra Place could have, including breach of the duty to settle and damages stemming from the breach. *See Liberty Mut.*, 353 P.3d at 995-96; *Valley Power*, 80 Nev. at 460, 396 P.2d at 138.

"Good conscience requires that the [primary insurer] be the party to suffer the loss" when the excess settlement amount is caused by the primary insurer's bad faith. *Scottsdale Ins. Co.*, 448 S.W.3d at 832. Ordinarily, the primary insurer would face liability for loss when its insured brings a suit on its own behalf against its insurer for failure to act in good faith, and "[a]n insurer's duty to act in good faith does not simply disappear when a prudent insured has obtained excess coverage." *Id.* Thus, as the party that pays the loss, the excess insurer "should be equitably subrogated to the rights of [the insured] and be able to bring a bad faith refusal to settle action in the name of [the insured]." *Id.* Therefore, because James River would face $4 million in liability for its alleged failure to settle in good faith in an action brought by Alhambra Place, James River faces this exact same liability in a suit brought by North River.

The fact that Alhambra Place itself suffered no actual damages by virtue of its insurance policies is irrelevant to our inquiry. Equitable subrogation may be applied even absent a showing that the insured suffered any loss: "[i]t is not a prerequisite to equitable subrogation that the subrogor suffered actual loss; it is required only that he would have suffered loss had the subrogee not discharged the liability or paid the loss." *Nw. Mut. Ins.*

SUPREME COURT
OF
NEVADA

(O) 1947A

12

*Co. v. Farmers' Ins. Grp.*, 143 Cal. Rptr. 415, 423 (Ct. App. 1978); *see also Troost v. Est. of DeBoer*, 202 Cal. Rptr. 47, 50 (Ct. App. 1984) ("Payment by the insurance company does not change the fact a loss has occurred."). To hold otherwise would preclude an insurer from ever pursuing subrogation, which is "[n]ot only . . . illogical, it contradicts decades of cases consistently holding that an insurer may be equitably subrogated to its insured's indemnification claims." *Interstate Fire & Cas. Ins. Co. v. Cleveland Wrecking Co.*, 105 Cal. Rptr. 3d 606, 615 (Ct. App. 2010). Thus, although Alhambra Place may not have actually suffered damages because North River funded the settlement, Alhambra Place would have incurred damages absent North River's payment because the settlement was in excess of Alhambra Place's primary policy. Alhambra Place *legally* suffered a loss, or damages, and North River, standing in Alhambra Place's shoes, has suffered the same loss.

In sum, equitable subrogation permits the excess insurer, as the party that paid the loss, to step into the shoes of the insured and pursue any claims against the primary insurer that the insured itself could have asserted. Because Alhambra Place could have pursued a claim against James River for failure to settle within primary policy limits had North River not paid the difference, North River, standing in Alhambra Place's shoes, can pursue the exact same claim.

*Policy considerations support our holding*

Our holding is bolstered by important policy considerations. "Courts of Appeal typically review important questions of public policy de novo because the appellate process is better suited to deciding such questions: We have more justices looking at the question with more time to review it." *People for Ethical Operation of Prosecutors & L. Enf't v. Spitzer*, 267 Cal. Rptr. 3d 585, 599 (Ct. App. 2020), *as modified* (Sept. 8, 2020).

As this court has observed, subrogation is an equitable doctrine aimed at effectuating a just and fair result. *AT & T*, 109 Nev. at 595, 855 P.2d at 535. Not surprisingly, courts often rely on policy considerations when examining equitable subrogation claims. For example, in *Peter v. Travelers Insurance Co.*, the court allowed the excess insurer to seek equitable subrogation against the primary insurer for the primary insurer's unwillingness to negotiate a reasonable, lower settlement. 375 F. Supp. at 1349-50. The court reasoned that "strong equitable and economic considerations . . . compel this result." *Id.* at 1350. That is,

> [i]f the primary carrier is relieved of its duty to accept reasonable offers by the existence of excess insurance, it would put an additional financial liability on the excess carrier which would be reflected in increased premiums. It would also have the effect of reducing the incentive of a primary insurer to settle when the settlement offer is near or over its policy limits. This is contrary to the interests of the public and the insured in obtaining prompt and just settlement of claims.

*Id.* at 1350-51. Similarly, in *Continental Casualty Co. v. Reserve Insurance Co.*, the Minnesota Supreme Court held that an excess insurer is subrogated to the insured's right against a primary insurer for breach of the primary insurer's good faith duty to settle. 238 N.W.2d 862, 864 (Minn. 1976). That court reasoned that its "result is supported by important policy considerations underlying our judicial and liability insurance systems." *Id.* The court explained that "when a primary insurer breaches its good-faith duty to settle within policy limits, it imperils the public and judicial interests in fair and reasonable settlements of lawsuits." *Id.* at 864-65.

We agree that public policy favors allowing excess insurers who contribute towards settlements to seek equitable subrogation against

SUPREME COURT
OF
NEVADA

(O) 1947A

14

primary insurers who fail to accept reasonable settlement offers. Doing so promotes fair settlement practices, disincentivizes primary insurers from rejecting reasonable settlement offers, and levels the playing field for insureds who have obtained additional, excess coverage.

## CONCLUSION

We conclude that an excess insurer may seek equitable subrogation against a primary insurer who fails to settle within primary policy limits when the insured, but for the excess insurer's contribution to the settlement, would have had a claim against the primary insurer for its failure to reasonably settle. The excess insurer who contributes to settlement may assert any claims against the primary insurer that the insured itself could have asserted. Whether the claim settled within the combined policy limits is not relevant to the equitable subrogation inquiry in this context. We therefore answer the question certified to us in the affirmative.

_____, C.J.
Herndon

We concur:

_____, J.
Pickering

_____, J.
Bell

_____, J.
Cadish

_____, J.
Parraguirre

_____, J.
Stiglich

_____, J.
Lee

SUPREME COURT
OF
NEVADA

(O) 1947A

15