Argued and submitted October 16, 2019, reversed and remanded
January 15, 2020

FRIENDS OF YAMHILL COUNTY
and Joyce Damman,
*Petitioners,*

*v.*

YAMHILL COUNTY
and Christian DeBenedetti,
*Respondents.*

Land Use Board of Appeals
2018144; A171950

458 P3d 1130

Petitioners seek judicial review of a final order of the Land Use Board of Appeals (LUBA) concerning Yamhill County's approval of a permit to conduct beer-tasting events on land that was zoned for exclusive farm use. The statute governing such permits, ORS 215.283(4)(d), allows a county to authorize certain "agri-tourism or other commercial events or activities" if, among other requirements, they are "incidental and subordinate to existing commercial farm use of the tract and are necessary to support the commercial farm uses or the commercial agricultural enterprises in the area." Petitioners argue that LUBA and the county erroneously believed that the "incidental and subordinate" prong of that requirement could be satisfied simply by comparing the number of days of tasting events to the number of days of farm use. *Held*: The phrase "incidental and subordinate to" is a term of art in the land-use context that means more than that the accessory use occurs less frequently than the primary use. Although frequency is one factor in comparing the main and accessory uses, the related concepts of "incidental" and "subordinate" reflect a conclusion about predominant use in light of many relevant factors, including the nature, intensity, and economic value of the respective uses. Because the county focused on the frequency of the events to the exclusion of other relevant factors, LUBA erred by affirming that aspect of the county's order.

Reversed and remanded.

Jeffrey L. Kleinman argued the cause and filed the brief for petitioners.

No appearance for respondent Christian DeBenedetti.

No appearance for respondent Yamhill County.

Before Lagesen, Presiding Judge, and DeVore, Judge, and Powers, Judge.

POWERS, J.

Reversed and remanded.

**POWERS, J.**

Petitioners seek judicial review of a final order of the Land Use Board of Appeals (LUBA) concerning Yamhill County's approval of a permit to conduct beer-tasting events on land that was zoned for exclusive farm use. The statute governing such permits, ORS 215.283(4)(d), allows a county to authorize certain "agri-tourism or other commercial events or activities" if, among other requirements, they are "incidental and subordinate to existing commercial farm use of the tract and are necessary to support the commercial farm uses or the commercial agricultural enterprises in the area." Petitioners argue that LUBA and the county erroneously believed that the "incidental and subordinate" prong of that requirement could be satisfied simply by comparing the number of days of tasting events to the number of days of farm use. As we explain below, we agree with petitioners that ORS 215.283(4)(d) contemplates something more than that type of comparison of days, and we conclude that LUBA erred in affirming that aspect of the county's decision.

The background facts are not disputed, so we draw them from LUBA's order. The property at issue is 21.5 acres in Yamhill County and is zoned exclusively for farm use ("EF-20"). The primary agricultural use of the property is a 10-acre orchard of filberts (also known as hazelnuts) operated by Springbrook Farms. The property, which is owned by Charles and Ellen McClure, is also being developed with a residence, guest house, and historic barn.

Christian DeBenedetti operates Wolves and People Farmhouse Brewery out of the barn, which includes a brewery and tasting room with outside seating.[1] The brewery and tasting room operate under a conditional use permit approved by the county in 2014. The brewery later applied for a separate permit to hold up to 18 commercial events per year on the property under Yamhill County Zoning Ordinance (YCZO) 1013.01(A)(4)(a). That code provision, which mirrors ORS 215.283(4), provides, in part:

"In the alternative [to other types of agri-tourism or commercial event or activities permits], up to 18 events on

---

[1] For readability, we use DeBenedetti and the brewery interchangeably.

a tract may be permitted in a calendar year subject to the following:

"a.    The events or activities are incidental and subordinate to existing commercial farm use of the tract and are necessary to support the commercial farm uses or the commercial agricultural enterprises in the area ***."

The county approved the application in 2017 for a one-year period, along with a condition that allowed the brewery to renew the permit for an additional four-year period.

In 2018, the brewery applied for that renewal, seeking approval to hold up to 18, 72-hour events per year for beer tastings with food to be provided by an outside caterer or a food cart. As part of the application process, the county asked the brewery to (1) describe the existing commercial farm use of the tract, (2) explain how the proposed events are incidental and subordinate to that existing commercial farm use, and (3) explain how the events are necessary to support the commercial farm uses or the commercial agricultural enterprises in the area. The brewery responded, in part:

"The primary year-round activity on Springbrook Farm is clearly filbert farming at this time, and under our conditional use permit, brewing is also going on successfully. The other crops, while carefully tended, do not approach the tonnage of filberts that are harvested each year. Having a small number of agritourism events on the property has no impact on filbert farming and does not encroach on any other kinds of farming in any way. In fact, the events are encouraging more plantings of fruits and vegetables that could play a bigger role in future agritourism events, such as melons or vegetables for chefs to prepare in their licensed kitchens and present to guests. There were only 14 days of events in the calendar year 2017, far below our allowed number of 54 days. We believe it is clear that we are not pressuring the permit so to speak. It is very difficult to find chefs and food carts of an appropriate quality for our operation."

After a hearing before the planning commission, the county approved the application. With regard to the standard described in YCZO 1013.01(A)(4)(a), the county looked to a dictionary definition of "incidental" and concluded that

"[e]vents or activities that are incidental to existing farm uses would be those that are less important, and subordinate to the existing farm uses on the tract." (Citing *Webster's Third New Int'l Dictionary* (unabridged ed 2002).).). It then made the following determination:

> "The county finds that the proposal to have a single food cart operating on the site, for no more than 72 hours per 'event,' no more than 18 times per year, is unquestionably incidental to the existing farm uses taking place on the property. The hours of operation at the brewery are Friday, 4-9 p.m., Saturday, 2-10 p.m. and Sunday 12-5 p.m. A condition of approval requires that the events end by 9:00 p.m., meaning that the food cart will operate fewer than the 72 hours allowed under the statute and ordinance. Under the approval granted by the county, the applicant can only operate the food cart over the course of 54 days out of the 365 available. Farm uses take place on the property 365 days per year. *By infrequency alone, the operation of the food cart as allowed under the approval is incidental to the farm use of the property. The infrequency of operation also supports the county's conclusion that operation of the food cart is a 'minor concomitant' when compared to the continued predominant use of the property to produce filberts and the other crops identified by the applicant.*"

(Emphasis added.)

The county then noted that "the dictionary definition of 'incidental' contains the phrase 'subordinate to,'" and went on to conclude that "the previously approved brewery and service of food at the level approved by this Order are clearly subordinate to the existing farm uses on the 21-acre site." The county further found that the agri-tourism events were "necessary to support" the agricultural uses on the property and the commercial agricultural enterprises in the area for purposes of YCZO 1013.01(A)(4)(a), in the sense that they supplemented the income from the farm operation, helped maintain the viability of the property as a farm, and brought more tourists to the area.

Petitioners appealed the county's decision to LUBA, raising two issues. First, petitioners asserted that the county had erred in determining that the proposed events were "necessary to support" the commercial farm uses in

the area and the commercial agricultural enterprises in the area. LUBA ultimately agreed with petitioners on that point, so it remanded the decision to the county. That aspect of LUBA's decision is not before us on judicial review.

The matter before us instead involves petitioners' second challenge, which LUBA rejected. In that challenge, petitioners argued that the county erred in its assessment of whether the proposed events were "incidental and subordinate to" the agricultural use of the property. In petitioners' view, the county misunderstood that requirement and simply compared the number of days of tasting events to farming days, without evaluating "the respective intensity or economic impact" of the activities compared to a "silently growing nut crop which does not require catering or entertainment." (Emphasis omitted.)

The brewery, in turn, responded that the phrase "incidental and subordinate" was not intended to impose an income, sales, or revenue limitation on the events, and that the use, not the revenue, must be subordinate. Thus, "[i]f an applicant demonstrates that the proposed events are incidental temporally, spatially, and in terms of intensity, he or she should not also be required to demonstrate that the events don't matter to him or her financially in order to establish that the events are 'incidental.'"

Before addressing those competing arguments, LUBA explained that, because YCZO 1013.01(A)(4)(a) was simply implementing the text of a state statute, ORS 215.283 (4)(d)(A), the county's interpretation of the relevant phrase—"incidental and subordinate to existing commercial farm use of the tract"—was not entitled to any deference. LUBA then proceeded to examine the text, context, and legislative history of ORS 215.283(4)(d)(A) and concluded that the county had not erred in the manner claimed by petitioners:

> "In this case, the county determined that the number of days of commercial events compared to the number of days of commercial farming activity on the property demonstrate that the commercial events are 'incidental and subordinate' to the commercial farming activities on the property because the commercial activities are 'less important

or less dominant.' That conclusion is consistent with the plain meanings of the phrase 'incidental and subordinate.'

"Nothing in the text, context, or legislative history of ORS 215.283(4)(d)(A) suggests to us that the county may not rely on a comparison of the number of days of activities to determine that commercial activities are less significant than the commercial farming activities on the property. Under the circumstances presented in this appeal, we conclude that the county correctly determined that the events are incidental and subordinate to the farm use."

Petitioners seek judicial review of that ruling, arguing that LUBA "both misconstrued petitioners' argument and made an error of law in its interpretation of the statute." According to petitioners, their briefing before LUBA did not seek a comparison of revenue between farm uses and commercial activities as the sole basis for determining whether the proposed agri-tourism events were "incidental and subordinate to existing commercial farm use of the tract"; rather, their primary argument was that "the county did not attempt to compare the respective intensity *or* economic impact of the existing farm use and the proposed events." (Emphasis by petitioners.) Neither the brewery nor the county has filed a responsive brief in this court.

We review LUBA's order to determine whether it is "unlawful in substance." ORS 197.850(9)(a). In so doing, we do not defer to LUBA's or the county's interpretation of YCZO 1013.01(A)(4)(a). Rather, as LUBA correctly observed, that code provision simply implements and repeats the text of ORS 215.283(4)(d), and the meaning of that underlying statute presents a question of law that we resolve by applying our ordinary interpretive methodology—examining the text, context, and relevant legislative history. *See Collins v. Klamath County*, 148 Or App 515, 520, 941 P2d 559 (1997) ("[W]hen a statute controls, the deferential review standard is also inapplicable to a local decision that nominally or purportedly interprets related local provisions instead of the statute itself. The meaning of the statute, rather than the local provisions, is the issue, notwithstanding any contrary characterization in the local decision." (Internal citations omitted.)); *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009) (outlining the methodology for interpreting statutory text).

We start with the text of ORS 215.283(4)(d), which provides:

> "In addition to paragraphs (a) to (c) of this subsection, a county may authorize agri-tourism or other commercial events or activities that occur more frequently or for a longer period or that do not otherwise comply with paragraphs (a) to (c) of this subsection if the agri-tourism or other commercial events or activities comply with any local standards that apply and the agri-tourism or other commercial events or activities:

> "(A)   Are incidental and subordinate to existing commercial farm use of the tract and are necessary to support the commercial farm uses or the commercial agricultural enterprises in the area;

> "(B)   Comply with the requirements of paragraph (c)(C), (D), (E) and (F) of this subsection;

> "(C)   Occur on a lot or parcel that complies with the acknowledged minimum lot or parcel size; and

> "(D)   Do not exceed 18 events or activities in a calendar year."

The terms at issue in subparagraph (A)—"incidental and subordinate to"—are not defined in the statute. "When the legislature has not defined a word or a phrase, we may assume, at least initially, that the word or phrase has its 'plain, natural, and ordinary' meaning." *DCBS v. Muliro*, 359 Or 736, 745-46, 380 P3d 270 (2016). Here, the ordinary meanings of those terms reflect some overlap. The word "incidental" ordinarily means "subordinate, nonessential, or attendant in position or significance * * * : occurring as a minor concomitant * * *; being likely to ensue as a chance or minor consequence." *Webster's* at 1142. "Subordinate," in turn, ordinarily means "placed in a lower order, class, or rank : holding a lower or inferior position." *Id.* at 2277.

There are times, however, when undefined statutory terms carry a more technical meaning, particularly when they are used as terms of art in a specialized area of the law. *See Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 296, 337 P3d 768 (2014) (observing that, when the legislature uses terms of art, the court will look to the meaning and usage of those terms in the discipline from which the legislature borrowed

them). In the context of land-use laws, the terms "incidental" and "subordinate" have a well-established history.

Treatises and legal dictionaries frequently use the terms "incidental" and "subordinate" to define the concept of "accessory" use in zoning laws. For instance, *The American Law of Zoning* defines an "accessory building" as one whose "use is *subordinate to or customarily incidental* to an existing permitted principal building located on the same lot." Patricia E. Salkin, 4 *Am Law Zoning*, Glossary of Terms, § 41:16 (5th ed) (May 2019 update) (emphasis added); *accord Black's Law Dictionary* 1681-82 (9th ed 2009) (defining "incidental use" as "[l]and use that is dependent on or affiliated with the land's primary use," and an "accessory use" as "[a] use that is dependent on or pertains to a main use"); *Zoning: What Constitutes "Incidental" or "Accessory" Use of Property Zoned, and Primarily Used, For Residential Purposes*, 54 ALR 4th 1034 (1987).

Those treatises reflect the long history of usage by courts and other government bodies regarding permitted accessory uses, including in Oregon. For instance, the court explained in *Yunker v. Means*, 271 Or 56, 59, 530 P2d 846 (1975), that "[a]n accessory building is a subordinate building incidental to the use of the main building. If it is an integral part of the main building, it cannot be accessory."

LUBA has also published various decisions interpreting and applying land use ordinances involving "accessory uses" or that refer to an "incidental" and "subordinate" use—often in the context of nonfarm uses that are conditionally permitted in exclusive farm use zones. *See, e.g.*, *Central Oregon Landwatch v. Deschutes County*, 52 Or LUBA 582, 597-98 (2006) (reviewing a county's determination that "any use is allowable in the F-1 zone as an accessory use, as long as it meets the code definition of accessory use, *i.e.*, a use incidental and subordinate to a permitted use of the property that is its main use"); *Durdan v. Deschutes County*, 43 Or LUBA 248, 257 (2002) ("To be 'incidental and accessory,' petitioners argue, the guest ranch must be subordinate to the primary ranching use of the property. According to petitioners, no reasonable person could conclude that a year-round lodge with 10 cabins, food service and recreational

activities, staffed by three to four employees, is incidental or subordinate to a ranching operation that consists of grazing 42 cows for a few months during the year, and that requires only one employee.").[2]

In that specialized context, the phrase "incidental and subordinate to" means more than that the accessory use occurs less frequently than the primary use. Although frequency is one factor in comparing the main and accessory uses, the related concepts of "incidental" and "subordinate" reflect a conclusion about predominant use in light of many relevant factors, including the nature, intensity, and economic value of the respective uses. As McQuillin's treatise on municipal law explains, uses for purposes of zoning laws "have been classified as primary and accessory, auxiliary or incidental," and the various factors to "determine whether a use or structure is accessory within the terms of a zoning ordinance" can include "the size of the land involved, the nature of the primary use, the use made of the adjacent lots by neighbors, the economic structure of the area and whether similar uses or structures exist in the neighborhood on an accessory basis." Eugene McQuillin, 8 *The Law of Municipal Corporations* § 25:151 (3d ed 2006); *accord McCormick v. City of Baker City*, 46 Or LUBA 50, 58 (2003) ("The city's decision does not explain why, under its basic approach of comparing the nature and scale of the tennis facility and dwelling, it is permissible to rely on two factors to the exclusion of other, highly relevant considerations. * * * [B]y focusing exclusively on the seasonal and noncommercial nature of the tennis facility, the challenged decision allows a use that in almost all other parameters dwarfs residential use of the property. We do not think the terms 'accessory,' 'incidental' and 'subordinate' are quite that elastic."); *Media Art Co. v. City of Gates*, 35 Or LUBA 123, 136 (1998) (explaining

---

[2] Before the enactment of ORS 215.283(4), ORS 215.283(2)(a) allowed counties to approve "[c]ommercial activities that are in conjunction with farm use." ORS 215.283(2)(a). In some cases, applicants who could not satisfy approval under that standard sought permits for "commercial activity accessory to farm use" under local "accessory uses and structures" provisions of local zoning codes. *See, e.g.*, *Reed v. Jackson County*, 61 Or LUBA 253, 255-56 (2010) (involving a petitioner's argument that a "wedding is allowed as a 'commercial activity accessory to farm use'" under a local development ordinance that "authorize[d] the establishment of accessory uses and structures that are incidental and customarily subordinate to principal uses in all zoning districts").

that "[w]hether a proposed use is 'incidental, appropriate and subordinate,' and hence accessory to the primary use of the property, will depend upon the circumstances, most particularly the nature of the primary use").

The statutory context of ORS 215.283(4)(d) strongly suggests that the legislature, by using the phrase "incidental and subordinate to existing commercial farm use of the tract," intended for counties to engage in a similar comparison of the nature, intensity, and economic value of the proposed agri-tourism events and the existing commercial farm use of a property, rather than relying solely on the frequency of the respective activities. ORS 215.283(4) establishes three different permitting pathways, each of which differs in terms of the size, frequency, and nature of the proposed activities.

Under the first pathway, a county may authorize a single agri-tourism event in a calendar year, as long as the duration does not exceed 72 consecutive hours; the maximum attendance does not exceed 500 people and 250 vehicles at the site; it occurs outdoors, in temporary structures, or in existing permitted structures; and certain other requirements are met. When further specified requirements are met, an "expedited" single agri-tourism event is authorized under that first pathway, and that decision is not even considered a land-use decision for purposes of review. ORS 215.283(4)(a), (b).

Under the second pathway, a county may authorize up to six agri-tourism events in a calendar year if, among other requirements, the events do not individually exceed 72 consecutive hours; do not require a new permanent structure be built, used, or occupied; do not, in combination with other events, materially alter the stability of the land-use pattern in the area; and comply with other established conditions regarding things like location of structures, access and egress, parking, traffic patterns, and solid waste. ORS 215.283(4)(c).

The third pathway, which is at issue in this case, is for agri-tourism events "that occur more frequently or for a longer period" or "that do not otherwise comply with paragraphs (a) to (c) of this subsection." ORS 215.283(4)(d).

A permit under that pathway authorizes up to 18 events in a calendar year when additional requirements are satisfied. *Id*.

Importantly, despite authorizing agri-tourism events of differing frequency and intensity, each pathway independently includes the requirement that the events be "incidental and subordinate to" existing farm use on the tract. ORS 215.283(4)(a)(A); ORS 215.283(4)(b)(A); ORS 215.283 (4)(c)(A); and ORS 215.283(4)(d)(A). In the absence of some contrary indication, we assume that the separately articulated requirement of "incidental and subordinate" use is not wholly redundant of other individual statutory requirements, including the frequency criteria (the 1-, 6-, and 18-day limitations) set forth in each of the respective pathways. *See State v. Clemente-Perez*, 357 Or 745, 755, 359 P3d 232 (2015) (observing that courts will generally assume that the legislature "did not intend any portion of its enactments to be meaningless surplusage"). Rather, that statutory context suggests that the legislature intended the "incidental and subordinate" use requirement to involve something beyond the other requirements, *viz*., a more wholistic comparison of the agri-tourism and farming uses, consistently with how that test had historically been applied to other types of accessory or secondary uses.

Legislative history confirms that understanding. ORS 215.283(4) was enacted in 2011 at the request of the Association of Oregon Counties and the Oregon Farm Bureau. Richard Whitman, the Governor's Natural Resources Advisor and the chair of a workgroup on the Senate bill that became ORS 215.283(4), testified about the different "pathways" created by the legislation. Audio Recording, Senate Committee on Environment and Natural Resources, SB 960, Apr 14, 2011, at 45:00 (testimony of Richard Whitman), https://olis.leg.state.or.us (accessed Dec 17, 2019). He explained that the "incidental and subordinate use" requirement meant that "we're talking about property where there's an existing farm use and this has to be a relatively small, side type of activity; it cannot dominate the use." *Id*. Whitman also responded to criticism that criteria like "incidental and subordinate" and "necessary to support" were "vague and undefined" and would require years of

litigation to clarify. *See* Audio Recording, Senate Committee on Environment and Natural Resources, SB 960, Apr 14, 2011, at 36:10 (testimony of Syd Freedman in opposition to SB 960), https://olis.leg.state.or.us (accessed Dec 17, 2019). Whitman explained that the standards were "fairly open-ended standards but they are terms of art that tie back to standards that have existed in our exclusive farm use laws for a long period of time; there's a body of case law already out there that defines what these terms mean." Audio Recording, Senate Committee on Environment and Natural Resources, SB 960, Apr 14, 2011, at 46:00 (testimony of Richard Whitman), https://olis.leg.state.or.us (accessed Dec 17, 2019).

On the House side, Art Schlack of the Association of Oregon Counties also confirmed that the phrase "incidental and subordinate" reflected terms of art in the land-use context. At a hearing before the Rules Committee, one of the committee members asked about the definition of those terms, stating that he was curious "what the consensus is of what is meant by *** incidental and subordinate to the existing conditional farm use." Audio Recording, House Rules Committee, SB 960, June 9, 2011, at 39:50 (statement of Rep Paul Holvey), https://olis.leg.state.or.us (accessed Dec 17, 2019). Schlack responded that

> "that language is not defined. It has been used in conjunction with other activities in the past. So it's kind of cribbed. There is some history. Certainly it is less than 50 percent, but I at this point do not, there is not a clear definition of incidental and subordinate."

Audio Recording, House Rules Committee, SB 960, June 9, 2011, at 40:23 (testimony of Art Schlack), https://olis.leg.state.or.us (accessed Dec 17, 2019).[3]

---

[3] At that point, Representative Holvey asked, "Less than 50 percent of the uses?" Audio Recording, House Rules Committee, SB 960, June 9, 2011, at 40:53 (statement of Rep Paul Holvey), https://olis.leg.state.or.us (accessed Dec 17, 2019). Schlack responded, "Less than 50 percent of the income." Audio Recording, House Rules Committee, SB 960, June 9, 2011, at 40:55 (testimony of Art Schlack), https://olis.leg.state.or.us (accessed Dec 17, 2019). Although Schlack's statement to the committee refers to income, the plain text of ORS 215.283(4)(d)(A) refers to the use—not the income—being incidental and subordinate. Thus, we are bound by what the legislature actually enacted, not by a fleeting remark by one witness before one committee. *See Gaines*, 346 Or at 172 (remarking that "a party seeking

For all of those reasons, we conclude that the legislature intended the phrase "incidental and subordinate to existing commercial farm use of the tract" to carry its established, technical meaning in the context of Oregon's land-use laws. The inquiry involves a consideration of any relevant circumstances, including the nature, intensity, and economic value of the respective uses, that bear on whether the existing commercial farm use remains the predominant use of the tract.

In light of our construction of the statute, we agree with petitioners that LUBA erred in affirming the county's determination that, "[b]y infrequency alone, the operation of the food cart as allowed under the approval is incidental to the farm use of the property." LUBA concluded that the county's determination based on "the number of days of commercial events compared to the number of days of commercial farming activity on the property" was "consistent with the plain meanings of the phrase 'incidental and subordinate.'" However, the phrase "incidental and subordinate to" is a term of art in this context that requires more than an evaluation of the frequency of the proposed events compared to farm use. LUBA correctly observed that the text, context, and legislative history of ORS 215.283(4)(d)(A) does not preclude a county from relying on a comparison of the number of days of activities, but frequency is only one factor. Because the county focused on that factor to the exclusion of other relevant factors, LUBA erred by affirming that aspect of the county's order.

Reversed and remanded.

---

to overcome seemingly plain and unambiguous text with legislative history has a difficult task before it"). Schlack's testimony is otherwise consistent with the view that "incidental and subordinate" is a term of art that considers more than the frequency of the respective uses and can include, as Schlack referenced, the economic relationship to the farm use.