Submitted April 24, affirmed July 1, 2020

Nicholas KAMPS-HUGHES,
*Respondent,*

*v.*

CITY OF EUGENE,
*Petitioner,*

*and*

Paul T. CONTE,
*Intervenor-Respondent below.*

Land Use Board of Appeals
2019115; A173517

470 P3d 429

Kamps-Hughes requested zone verification from the City of Eugene with respect to his proposal to build a detached accessory dwelling unit (ADU) on his property, which already contains a single-family dwelling. The city issued a zone-verification decision that identified various Eugene Code provisions that it considers applicable to the proposal, effectively precluding Kamps-Hughes from building an ADU on his property. Kamps-Hughes appealed to the Land Use Board of Appeals (LUBA), contending that, under ORS 197.312(5)(a), the city may only impose "reasonable local regulations relating to siting and design" with respect to the development of an ADU on his property and that certain of the code standards cited by the city are not related to siting or design. As to four of the code standards, LUBA agreed with Kamps-Hughes and reversed. The city seeks judicial review, arguing that LUBA misconstrued ORS 197.312(5)(a) and that the four code standards relate to "siting" within the meaning of the statute. *Held*: LUBA did not err. Based on the text, context, and legislative purpose, "siting" as used in ORS 197.312(5)(a) refers to where ADUs are sited on lots, not to where ADUs are allowed within the city or a particular zone.

Affirmed.

Emily N. Jerome filed the brief for petitioner.

Bill Kloos and Law Office of Bill Kloos PC filed the brief for respondent.

Christopher D. Crean and Beery, Elsner & Hammond, LLP, filed the brief *amicus curiae* for League of Oregon Cities.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Aoyagi, Judge.

AOYAGI, J.

Affirmed.

**AOYAGI, J.**

ORS 197.312(5)(a) provides that cities and counties over a certain size "shall allow in areas within the urban growth boundary [(UGB)] that are zoned for detached single-family dwellings the development of at least one accessory dwelling unit [(ADU)] for each detached single-family dwelling, subject to reasonable local regulations *relating to siting and design*." (Emphasis added.)[1] Kamps-Hughes, who wants to build an ADU on his property, requested zone verification from the City of Eugene, including asking the city to identify Eugene Code (EC) provisions that it considers applicable to his ADU proposal. In response, the city identified 11 standards that it views as relating to "siting and design" and that effectively preclude Kamps-Hughes from building an ADU. Kamps-Hughes appealed to the Land Use Board of Appeals (LUBA), asserting that, as to six of the standards, the city is misinterpreting the statutory phrase "relating to siting and design" and thus imposing impermissible restrictions on ADU development. In its final order, LUBA agreed with Kamps-Hughes as to four of the standards. The city seeks judicial review, arguing that LUBA misconstrued ORS 197.312(5). We affirm.

## FACTS

The pertinent facts are set out in LUBA's final order and are unchallenged. Kamps-Hughes owns real property in the Fairmount neighborhood of Eugene. The property is zoned Low Density Residential (R-1), has a lot size of 5,663 square feet (72.9 feet by 80 feet), and is accessible only via an alleyway. There is a single-family dwelling on the property—a two-story, four-bedroom house totaling 1,680 square feet—that is currently used as a residential rental.

This appeal arises from Kamps-Hughes' ongoing efforts to obtain verification from the city as to whether he can build a detached ADU on his property. Kamps-Hughes first submitted a zone-verification request in July 2018,

---

[1] ORS 197.312 has been amended since this case began, but the amendments do not affect our analysis, so all citations to ORS 197.312 are to the current statute. Similarly, certain Eugene Code provisions cited herein have been amended since this case began, but those amendments do not affect our analysis, so all citations to the Eugene Code are to the current code.

seeking to resolve that question. *See* EC 9.1080 (describing zone verification as a process "used by the city to evaluate whether a proposed building or land use activity would be a permitted use or subject to land use application approval or special standards applicable to the category of use and the zone of property"). In response, the city planner issued a zone-verification decision stating that a detached ADU was not permitted on the property because a Eugene Code provision prohibits ADUs on alley-access lots.

Kamps-Hughes appealed to LUBA, arguing that the city planner had failed to apply ORS 197.312(5)(a), enacted in 2017, which provides:

> "A city with a population greater than 2,500 or a county with a population greater than 15,000 shall allow in areas within the urban growth boundary that are zoned for detached single-family dwellings the development of at least one accessory dwelling unit for each detached single-family dwelling, subject to reasonable local regulations relating to siting and design."

LUBA agreed with Kamps-Hughes that the city planner had erred in not applying ORS 197.312(5) and remanded for her to do so. Meanwhile, Kamps-Hughes filed a second zone-verification request in December 2018.

On remand, the city planner issued a zone-verification decision that Kamps-Hughes's proposed second dwelling was not a permitted use in the R-1 zone and did not qualify as an ADU under ORS 197.312(5). Kamps-Hughes appealed to LUBA. LUBA concluded that the city planner had misconstrued ORS 197.312(5), that the proposed second dwelling met the statutory definition of an ADU, and that the city therefore had to allow the proposed ADU, subject only to "reasonable local regulations relating to siting and design." ORS 197.312(5)(a). LUBA remanded to the city, expressing no opinion as to what qualified as "reasonable local regulations relating to siting and design," because the city had yet to apply any such regulations.

On remand, the city planner issued a third zone-verification decision, this time addressing particular Eugene Code provisions that the city would apply to Kamps-Hughes's proposed ADU, including 11 standards that the

city considers "reasonable local regulations relating to siting and design." The practical effect of those standards is to preclude Kamps-Hughes from building an ADU on his property. Kamps-Hughes again appealed to LUBA, arguing, among other things, that six of the standards do not relate to "siting and design" and therefore constitute impermissible local restrictions on ADU development. In response, the city argued that all six standards relate to the "siting and design" of ADUs and thus are permissible restrictions under ORS 197.312(5)(a).

LUBA agreed with Kamps-Hughes that four of the standards do not relate to "siting and design" and that their application to Kamps-Hughes's ADU proposal therefore is inconsistent with ORS 197.312(5)(a).[2] Those four standards are:

- a prohibition on new ADUs on lots accessed only by an alleyway, EC 9.2741(2) and 9.2751(18)(a)(2);

- a minimum lot-size requirement of 7,500 square feet, EC 9.2751(17)(c)(1);

- a minimum lot-dimension requirement of 45 feet by 45 feet, EC 9.2751(17)(c)(2); and

- occupancy limits for an ADU, EC 9.2751(17)(c)(7).

In short, the city had argued to LUBA that those four standards relate to "siting" because they relate to "where in each of the city's residential zones ADUs are allowed based on factors such as traffic, livability, and existing density," whereas Kamps-Hughes had argued that they do not relate to "siting" because regulations "relating to siting" means regulations that "specify the location of an ADU *on a site*," which none of those four standards do. LUBA agreed with Kamps-Hughes and rejected the city's more expansive view of "siting."[3]

---

[2] LUBA agreed with the city that the other two challenged standards *do* relate to siting and design. Because Kamps-Hughes has not cross-appealed and does not challenge that determination, we do not discuss those other two standards.

[3] Although not at issue on appeal, we note that, while LUBA agreed with Kamps-Hughes that four of the city's standards for ADU development are inconsistent with ORS 197.312(5)(a), LUBA rejected Kamps-Hughes's separate

The city appeals LUBA's final order, asserting a single assignment of error in which it challenges LUBA's construction of ORS 197.312(5).

## ANALYSIS

We will reverse LUBA's order if it is "unlawful in substance." ORS 197.850(9)(a); *Columbia Pacific v. City of Portland*, 289 Or App 739, 745, 412 P3d 258, *rev den*, 363 Or 390 (2018). In this case, our task is to determine whether LUBA's construction of ORS 197.312(5) is legally correct, as relevant to whether the city may apply the four aforementioned standards to ADU development without contravening the statute. Toward that end, "we employ our usual methodology to determine the legislature's intention in enacting a statute by looking at the text of the statute in context, along with any useful legislative history." *Oregon Mutual Ins. Co. v. Certain Underwriters*, 295 Or App 790, 795, 437 P3d 232 (2019).

As a preliminary matter, we must determine what portion of ORS 197.312(5) is at issue. In its opening brief, the city asserts that the "first interpretative" issue for us is to construe ORS 197.312(5)(b) to determine whether Kamps-Hughes's proposed second dwelling meetings the statutory definition of an ADU. Kamps-Hughes responds that that issue is not properly before us, because LUBA decided in a previous final order that Kamps-Hughes's proposed second dwelling *does* meet the statutory definition of an ADU, and the city did not seek judicial review of that order. Relatedly, Kamps-Hughes notes that, because that issue had already been decided in an earlier proceeding, the parties did not brief it to LUBA in this proceeding, nor did LUBA address it. We agree with Kamps-Hughes that the ADU-definitional issue is not reviewable in this appeal. An appellate court cannot "review legal issues that LUBA decided, not in the order under review, but in an earlier order in the same case, for which judicial review was not sought." *Beck v. City of Tillamook*, 313 Or 148, 151, 831 P2d 678 (1992). We therefore

---

argument (which it described as Kamps-Hughes's "major premise") that ORS 197.312(5)(a) precludes any local regulation that in effect prevents the development of at least one ADU on each lot with a single-family dwelling, even if the regulation is "reasonable" and relates to "siting and design."

accept as established that Kamps-Hughes's second dwelling is an ADU under ORS 197.312(5)(b).

What *is* properly before us is the city's argument that LUBA misconstrued the phrase "reasonable local regulations relating to siting and design" in ORS 197.312(5)(a). The crux of that argument is that LUBA erred in adopting Kamps-Hughes's interpretation of the word "siting," instead of the city's interpretation of the word "siting," although the city also makes arguments about the words "reasonable" and "relating to," to the effect that they provide context for the word "siting" that supports the city's interpretation of "siting." Kamps-Hughes maintains that LUBA did not err and that LUBA's construction is consistent with the text, context, and legislative purpose.

Notably, the meaning of "design" is not in dispute. The city argues, Kamps-Hughes implicitly agrees, and we too agree that the legislature intended "relating to siting and design" to be read disjunctively. That is, with respect to the development of ADUs, ORS 197.312(5)(a) permits reasonable local regulations that relate to siting, design, or both. *See Webster's Third New Int'l Dictionary* 80 (unabridged ed 2002) (defining "and" to include "reference to either or both of two alternatives *** esp. in legal language when also plainly intended to mean *or*" (emphasis in original)); *see also, e.g.*, *Ollilo v. Clatskanie P. U. D.*, 170 Or 173, 180, 132 P2d 416 (1942) ("'[A]nd' may be construed to mean 'or' when necessary to effectuate the intention of the legislature and to avoid an unreasonable or absurd result[.]"). In this case, the city argues that the four standards at issue relate only to "siting," not "design," so we limit our analysis to whether LUBA correctly construed the phrase "relating to siting."

We begin with the statutory text, as "there is no more persuasive evidence of the intent of the legislature." *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009). As previously described, ORS 197.312(5)(a) provides that "[a] city with a population greater than 2,500 or a county with a population greater than 15,000"—which it is undisputed includes the City of Eugene—"shall allow in areas within the urban growth boundary that are zoned for detached single-family dwellings the development of at least one

accessory dwelling unit for each detached single-family dwelling, *subject to reasonable local regulations relating to siting and design.*" (Emphasis added.)

The word "siting" is not defined in the statutory scheme, so LUBA looked to a dictionary to discern its "plain, natural, and ordinary meaning." *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993) (as a rule of statutory construction, "words of common usage typically should be given their plain, natural, and ordinary meaning"). Noting that "siting" is a gerund derived from "site," LUBA correctly identified the relevant common definition of "site" as "**2 a :** the local position of building \*\*\* either constructed or to be constructed esp. in connection with its surroundings \*\*\* **b :** a space of ground occupied or to be occupied by a building \*\*\* **c :** land made suitable for building purposes by dividing into lots, laying out streets, and providing facilities." *Webster's* at 2128.

In LUBA's view, "the dictionary definition of the word 'site' is specific to a particular property, and not to a wide area, and supports an interpretation of the word 'siting' as relating to an ADU's location or placement on a property that includes a single-family dwelling." In its final order, LUBA cites "examples" of "typical siting regulation[s]" as including "a setback that requires a building located on a property to be constructed some specified distance from a marker, such as a property line"; "a requirement that development not occur in a wetland or otherwise environmentally sensitive area or inside a floodplain"; or "an access site distance requirement to ensure safe ingress and egress."

The city does not contest that LUBA's interpretation is one meaning of "siting." Indeed, the city itself uses "siting" in that manner in its own brief, stating, for example, that, under the Eugene Code, "only one single-family dwelling may be sited" on an alley-access lot. The city argues, however, that LUBA erroneously relied *solely* on the common meaning of the word and failed to consider that "siting" has a "a technical meaning in the land use arena" that must also be considered. *See Friends of Yamhill County v. Yamhill County*, 301 Or App 726, 733, 458 P3d 1130 (2020) ("There are times, however, when undefined statutory terms carry

a more technical meaning, particularly when they are used as terms of art in a specialized area of the law."). The city argues that the "technical meaning" of "siting" is "clear from its abundant use through the State's land use laws," and the city and *amicus curiae* League of Oregon Cities (LOC) cite various statutes that use the word "siting" to describe the placement of things within a larger area, rather than on an individual lot. For example, ORS 197.296(6)(a) requires a city to amend its UGB in certain circumstances to "include sufficient land reasonably necessary to accommodate the siting of new public school facilities."

We agree with the city that "siting" may refer to the placement of a particular type of facility or building within a larger area (such as the area within a UGB) or may refer to the placement of a facility or building within a smaller area (such as the area within an individual lot). In our view, however, those dual possibilities are both consistent with the dictionary definition of "site." To the extent LUBA viewed the dictionary definition otherwise, we diverge on that point. We instead agree with the city that the word "siting," in isolation, could refer to the siting of ADUs within areas of the city zoned for detached single-family dwellings, the siting of ADUs on individual lots, or both.[4] The question is which meaning the legislature intended, which requires us to look to context and any helpful legislative history.

The context of "siting" supports LUBA's construction. Most significantly, ORS 197.312(5)(a) requires cities and counties over a certain size to allow, in areas within their UGBs that are zoned for detached single-family dwellings, "the development of at least one [ADU] *for each detached single-family dwelling*," subject only to reasonable local regulations relating to siting and design. (Emphasis added.) The specificity of that provision is telling. It focuses on individual single-family dwellings, which is consistent with an "individual lot" view of siting. Moreover, the express imposition of a one-to-one allowance ratio defeats the city's

---

[4] Although the city never says so expressly, we understand it to be arguing that "siting" in ORS 197.312(5)(a) encompasses *both* types of siting. That is, we understand the city to view ORS 197.312(5)(a) as allowing it to regulate where ADUs are placed within areas of the city zoned for detached single-family dwellings *and* to regulate where ADUs are placed on individual lots.

specific proposed construction. As we understand it, the city is relying on its interpretation of "siting" to posit a construction of ORS 197.312(5)(a) under which the city could effectively ignore the statutory one-to-one allowance ratio and impose any "reasonable" limitation on where ADUs may be built within areas zoned for single-family dwellings, even if it resulted in the allowance of far fewer than one ADU per single-family dwelling. The city's proposed construction would thus effectively read the one-to-one allowance ratio out of the statute.

That does not entirely resolve the issue, however, because there is a potentially plausible variation on the city's argument that would use the city's interpretation of "siting" but still give effect to the one-to-one allowance ratio. Specifically, one could read ORS 197.312(5)(a) as giving cities and counties authority to regulate which lots within areas zoned for single-family dwellings are allowed to have ADUs by application of a broad range of "siting" regulations, so long as the total ratio of allowed ADUs to single-family dwellings remained one-to-one. Under that reading, for example, the city could prohibit ADUs on 50 percent of the lots in an area within its UGB that is zoned for detached single-family dwellings, by application of minimum lot-size requirements and the like, so long as the city allowed at least *two* ADUs on the remaining 50 percent of the lots in that area, to satisfy the one-to-one allowance ratio.

Although it is possible that that is what the legislature intended, it seems unlikely. LUBA's construction of ORS 197.312(5)(a) is relatively straightforward and easy to apply. It requires cities and counties to allow the development of at least one ADU per detached single-family dwelling in areas within the UGB zoned for detached single-family dwellings, subject only to reasonable local regulations as to where ADUs may be placed on individual lots and their design. By contrast, an alternative construction that would incorporate the city's interpretation of "siting" while still giving effect to the allowance ratio—that cities and counties must allow the development of at least one ADU per detached single-family dwelling in areas within the UGB zoned for detached single-family dwellings, but that they have broad discretion

to decide where ADUs may be placed throughout those areas, as long as the ultimate ratio is one-to-one—would be impractical to apply, particularly with regard to ensuring compliance with the allowance ratio. No one is championing such a difficult-to-apply construction of ORS 197.312(5)(a), and we conclude that the legislature more likely intended LUBA's construction than that one.[5]

As for the city's argument (supported by LOC) that there are far more Oregon statutes that use "siting" to refer to "siting" within a larger area—such as statutes that pertain to the "siting" of new airports, new corrections facilities, destination resorts on the Metolius River, dwellings and other structures in landslide areas, new school facilities, wineries, and energy facilities[6]—than there are Oregon statutes that use "siting" to refer to siting limitations on individual lots, we do not find that argument persuasive. For one thing, we do not understand the city to be arguing that "siting" does *not* include siting on a lot but, rather, that it also can mean siting in a larger area. *See* 305 Or App at 232 n 4. For another thing, it is entirely unsurprising that the state legislature would tend to concern itself with overall urban planning and with legislation that ensures adequate public facilities in larger areas, while leaving regulation at the individual-lot level to local authorities. Indeed, that is precisely what ORS 197.312(5) does: it reflects the legislature's general urban-planning policy decision to promote ADU development by allowing at least one ADU per single-family dwelling in areas zoned for detached single-family dwellings, but it leaves to cities and counties the task of regulating (reasonably) where ADUs may be sited on individual lots and how they are designed.

---

[5] Of course, as previously noted, LUBA rejected Kamps-Hughes's argument that the statute literally requires the city to allow at least one ADU on *every* lot, and we do not mean to suggest that we disagree with that conclusion. To the contrary, we express no opinion on that issue, as it is not before us. Our point is merely that the practical realities of the one-to-one allowance ratio make it unlikely that the legislature intended "siting" to be interpreted in a way that would allow the city to preclude ADU development on many lots and thus make it very complicated to apply and enforce the express allowance ratio.

[6] In providing examples from the city's and LOC's briefing, we do not necessarily agree with the city's and LOC's express or implied construction of all of the relevant statutes and express no opinion as to the correct construction of any one of those statutes.

Finally, LUBA's construction is the most consistent with the legislature's purpose to increase the availability of affordable housing. ORS 197.295 to 197.314 are sometimes referred to as Oregon's "needed housing statutes." *Warren v. Washington County*, 296 Or App 595, 597, 439 P3d 581, *rev den*, 365 Or 502 (2019). In 2017, the legislature amended a number of those statutes, including adding ORS 197.312(5). The addition of ORS 197.312(5), as well as other aspects of that legislation, "reflect an intention to promote certain housing development":

> "For example, the legislation includes provisions that, under specified circumstances, impose relatively short timelines for processing applications for development of affordable multifamily housing, prohibit counties from reducing the density associated with certain proposed housing developments, redefine 'needed housing' to expressly address 'affordab[ility] to households within the county with a variety of incomes,' *require certain municipalities to allow accessory dwelling units*, and permit places of worship to use their real property to provide affordable housing. Or Laws 2017, ch 745, §§ 1, 2, 3, 4, 6, 7, 8. Each of those provisions may be viewed as promoting housing development * * *."

*Warren*, 296 Or App at 600 (emphasis added).[7]

Given that the general purpose of the legislation was to promote housing development (including denser housing development) and that the specific purpose of ORS 197.312(5) was to permit more ADU development, we agree with LUBA that the city's "wide ranging definition of a siting regulation as one that determines where in areas of the city zoned for residential development ADUs can be developed is not consistent with the legislature's intent to create more housing and more housing types, including more ADUs, because a city could effectively prohibit development of ADUs in most areas of a city through adoption or application of minimum lot sizes" and the like. Although a modified version of the city's proposed construction—adopting the city's interpretation of "siting" but giving effect to the one-to-one allowance ratio—would be consistent with the legislative purpose, its

_____

[7] Beyond the general purpose of the 2017 legislation, the parties have not identified, and we are not aware of, any useful legislative history of ORS 197.312(5)(a).

impracticality leads us to believe that the legislature did not intend that construction.

To put it another way, in enacting ORS 197.312(5)(a), the legislature made a statewide policy decision that, in cities and counties over a certain size, it is desirable as a matter of urban planning to allow one ADU per single-family dwelling in areas within a UGB that are zoned for detached single-family dwellings, thus increasing the density of housing development in those areas. The considerations underlying the four Eugene Code standards at issue in this appeal—minimizing density and thereby limiting traffic, increasing livability, and preserving neighborhood character—are essentially policy arguments *against* ADU development in existing residential neighborhoods. The city's proposed construction of ORS 197.312(5)(a) would effectively disregard the legislature's own statewide policy determination in the guise of "siting" regulations.

On that point, the city argues that the "reasonableness" limitation in ORS 197.312(5)(a) would ensure that the city did not abuse its discretion in deciding where to allow ADUs within areas zoned for single-family dwellings—and that LUBA's construction of "siting" "fail[s] to give any meaning at all to the term 'reasonable.'" We disagree on both points. It is primarily the one-to-one allowance ratio, not the "reasonableness" limitation, that prevents cities and counties from circumventing the legislative intent. As for LUBA's construction of "siting" purportedly depriving the word "reasonable" of any effect, the city seems to assume that all local regulations regarding where ADUs are placed on individual lots are necessarily reasonable, such that there would be no point in imposing a "reasonableness" limitation if that is what "siting" means. But that is a false premise. Local regulations related to where ADUs may be placed on individual lots may be reasonable or unreasonable, and only reasonable ones are allowed under ORS 197.312(5)(a). The reasonableness limitation has full effect under LUBA's interpretation of "siting."

We are similarly unpersuaded by the city's argument that LUBA's construction of "siting" fails to give any effect to the contextual words "relating to." The thrust of

the city's argument is that "relating to" means "directly or indirectly relating to," not only "directly relating to." Even if LUBA had interpreted "relating to" as meaning "directly relating to," rather than "directly or indirectly relating to," that would not deprive the phrase "relating to" of any effect—it would deprive it only of the city's preferred effect. In reality, however, we do not understand LUBA to have expressed any view on how directly a regulation must relate to siting, or how indirectly it may relate to siting, to be permissible under ORS 197.312(5)(a). Instead, we understand LUBA to have focused—appropriately—on whether the four regulations relate to siting *at all*, as determined by what the legislature intended "siting" to mean.

Finally, the city argues briefly that a 2019 amendment codified at ORS 197.312(5)(b)(B)—which expressly excludes owner-occupancy requirements and new off-street-parking requirements from the definition of "[r]easonable local regulations relating to siting and design"—supports the city's interpretation of "siting," because it necessarily recognizes owner-occupancy and off-street-parking requirements as "siting" regulations. We generally do not consider later-enacted amendments in construing statutory language. *See DeFazio v. WPPSS*, 296 Or 550, 561, 679 P2d 1316 (1984) ("The views legislators have of existing law may shed light on a new enactment, but it is of no weight in interpreting a law enacted by their predecessors."). In any event, although the city assumes that the 2019 legislature viewed those specific types of regulations as relating to siting but unreasonable, it is as likely that it viewed them as not relating to siting or design at all and simply wanted to act quickly to stop their being used to prevent ADU development. In this very case, in its first zone-verification decision, the city cited its owner-occupancy requirement as an additional reason that Kamps-Hughes could not build an ADU on his property.

In sum, based on the text, context, and legislative purpose of ORS 197.312(5)(a), we agree with LUBA that reasonable local regulations "relating to siting" means reasonable local regulations relating to where ADUs are sited on a lot, not where they are sited within areas zoned for detached single-family dwellings.

The only remaining question, then, is whether LUBA correctly applied the statute, so construed, to Eugene's regulations prohibiting new ADUs on lots accessed only by an alleyway (EC 9.2741(2) and EC 9.2751(18)(a)(2)), imposing a minimum lot-size requirement of 7,500 square feet (EC 9.2751(17)(c)(1)), imposing a minimum lot-dimension requirement of 45 feet by 45 feet (EC 9.2751(17)(c)(2)),[8] and imposing occupancy limits for an ADU (EC 9.2751(17)(c)(7)). The city effectively concedes that, if LUBA's interpretation of "siting" is correct, then none of those regulations relate to "siting," and we agree. As to the minimum lot-size requirement, minimum lot-dimension requirement, and occupancy limits, we readily conclude that those are not regulations relating to siting. The alley-access prohibition is a closer question, but we ultimately conclude that it too is not a regulation relating to siting.

Accordingly, LUBA did not err in its construction and application of ORS 197.312(5)(a) to the four ADU development standards at issue.

Affirmed.

---

[8] Kamps-Hughes's property appears to meet the minimum lot-dimension requirement in EC 9.2751(17)(c)(2), but no one has suggested that that affects our ability to address it.